**William Dennis RIGGS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 17448.**

United States Court of Appeals
Fifth Circuit.

June 30, 1960.

Robert B. Thompson, Gainesville, Ga., for appellant.

David C. Clark, Jr., Asst. U. S. Atty., E. Coleman Madsen, U. S. Atty., S. D. Florida, Miami, Fla., for appellee.

Before RIVES, Chief Judge, and HUTCHESON and BROWN, Circuit Judges.

RIVES, Chief Judge.

The appellant was indicted jointly with three other defendants: Procacci, Zambotti and Jeff. The indictment contained thirteen counts charging violations of the Internal Revenue Laws relating to distilled spirits. Prior to the trial, defendant Jeff pleaded guilty and Counts 6 to 9, inclusive, which related to Jeff alone went out of the case. Appellant and the other two defendants, Procacci and Zambotti, were tried together. Count 1 was a typical moonshine conspiracy count and was the only count involving the appellant. The jury found the appellant guilty. Appealing from his conviction,

the appellant specifies a single error, namely, that the district court erred in denying his motion for judgment of acquittal.

Counsel for both sides have materially aided this Court in its analysis of the complicated and involved testimony by detailed statements of the evidence which have few substantial differences. We quote the statement of the evidence contained in the Government's brief, and add emphasis to those parts bearing most directly on the critical question of whether the appellant was proved to be a party to the criminal conspiracy.

"* * * Pursuant to confidential information on January 24, 1957, Florida Beverage agents Lester and Wood conducted an investigation of the Bee Fee Dog Food Company, Hallandale, Broward County, Florida. This investigation was conducted in the evening of January 24, 1957, and the agent smelled mash emanating from the premises. As there was no activity around the premises, the agents returned to Miami. The next afternoon, around 1:30 P.M., the agents, along with Federal Agent Brown, returned and put the premises under surveillance. A 1955, green Ford truck, hereafter referred to as the truck, was seen parked at the rear of the Bee Fee Dog Food Company. A black and white 1957 Ford station wagon, hereafter referred to as the station wagon, was parked at the front. Shortly after the agents' arrival, an unidentified Negro moved the truck from the back to the front of the building.

"Thereafter, the Negro and the defendant Procacci moved several drums or barrels from the building into the truck. About 3:30 P.M. the station wagon was driven off by defendant Procacci; and, at about 3:45 P.M., the Negro left in the truck. The agents followed the truck to West 21st Street and Palm Avenue, Hialeah, Dade County, Florida, where the Negro parked the truck just off the roadway of West 21st Street on the Southwest corner of the intersection.

"Shortly after 4:00 P.M., defendant Procacci was seen sitting in his station wagon, with the Negro, at the corner of 21st Street and Palm Avenue, Hialeah. Some time around 4:30 or 5:00 P.M., defendant Procacci left the station wagon and entered a black Lincoln, driven by a white male. *Shortly thereafter, a white male driving a canary yellow 1956 Mercury Coupe with white wall tires and a Continental kit pulled up alongside the truck. The Lincoln, containing defendant Procacci and another white male, then pulled alongside the Mercury and the occupants of the cars were seen conversing through two changes of the traffic light on Palm Avenue and 21st Street. The two cars then drove off in different directions.*

"The agents continued their observation of the truck until 6:15 P.M., when the truck left the place where it was parked. *They then followed the truck, driven by a Negro, to the Deluxe Dog Food Plant located at 2498 West 3rd Court, in Hialeah, Florida. The truck headed into the loading platform of the Deluxe Dog Food Plant and parked close to a yellow Mercury. Agent Wood testified it was the same Mercury he had seen previously on 21st Street and Palm Avenue. Agent Brown testified that the Mercury fitted all the physical descriptions of the one observed earlier. Agent Lester testified the Mercury was basically the same car.*

"The Negro got out and went up to the platform. The doors were open into the Deluxe Dog Food Plant and there was a light inside the building, shining out on to the platform. *Shortly thereafter the Mercury departed.*

"About 7:00 P.M., the same station wagon seen earlier, drove up

and the Negro truck driver came down off the platform and conversed with a white male in the station wagon. The station wagon then left the platform and the Negro got into the truck and backed it around to the north side of the dog food company into a darkened area.

"At approximately 7:30 P.M., a Buick pulled into the area where the truck had been moved. Two white males then left the platform and went to the vicinity of the truck and the Buick. The station wagon then arrived and parked at the platform. Sounds of the movement of cans in the immediate area of the Buick and the truck were heard. At about 7:40 P.M., the station wagon left, and five minutes later, the Buick left, riding very low in the rear, as though heavily loaded.

"At approximately 7:50 P.M., after the Buick left, the station wagon reappeared, stayed a few minutes and then left. *At 8:05 P.M., the yellow Mercury reappeared at the loading platform.* At approximately the same time, a Packard proceeded directly to the location where the truck had been parked. The lights were turned off and two males left the loading platform and moved out to the location of the truck and the Packard. The officers then heard the sound of cans being moved in the vicinity of the two vehicles, and about 10 minutes later the Packard left, riding very low in the rear, as though heavily loaded. Agent Lester, stationed nearby, followed the Packard and found it to contain twenty-one cans of illicit whiskey. At approximately 8:40 P.M., the station wagon returned and the Negro truck driver got into the station wagon, which was driven by a white man, and they drove off. *At approximately 9:00 P.M., two white men came out of the Deluxe Dog Food Plant, one of which got into the Mercury parked by the loading platform,*

*and the other went over to the location of the truck. Both vehicles were started and the driver of the Mercury backed up and pulled out of the way; the driver of the truck then pulled past the Mercury and proceeded south on West 3rd Court, followed closely by the Mercury.*

"Federal Agent Behen, who was stationed approximately one block east of the Deluxe Dog Food Plant, saw the lights of the truck and the Mercury leave the plant. The Mercury followed the truck by a distance of several car-lengths (sic). Agent Behen then followed the vehicles for several blocks and radioed the other officers to stop the truck; *he then stopped the Mercury and arrested the driver, who was appellant Riggs.*

*"Agent Lester simultaneously stopped the truck which was being driven by defendant Zambotti directly ahead of the Mercury, and which was loaded with fifty-seven 5-gallon tin cans of cold moonshine whiskey.* Agent Behen testified that, at the time of appellant's arrest, appellant stated he was president or owner of the Deluxe Dog Food Company, and had just come from there. Agent Behen also testified that at the time of the arrest defendant *Zambotti* stated the truck belonged to the appellant. Behen also testified that when he later questioned the appellant and defendant Zambotti, *appellant stated he had been at the Deluxe Dog Food Plant from 6:30 P.M. until approximately 9:00 P.M.,* but denied the truck had been at the plant, and further stated the truck had not left immediately in front of him. He said the first time he saw the truck that night was when he was arrested, which was at approximately 9:00 P.M., January 25, 1957.

"Following the arrest, *no moonshine was found in the Mercury, and when Agent Behen returned to the Deluxe Dog Food Plant, he searched*

*the refrigeration box and found no whiskey.*

"The next morning, a Federal search warrant was issued for the Bee Fee Dog Food Company, Hallandale, Florida, and a 2,275 gallon unregistered distillery was located there. The Government then rested its case and appellant moved for a directed verdict, which was denied.

"The defendant Zambotti chose not to testify.

"Defendant Procacci took the stand in his own defense and stated he merely operated the Bee Fee Dog Food Plant for a person by the name of John Murphy of Philadelphia, whose address was unknown. He also stated he only knew the truck driver, his employee, as Floyd, and had no address for him. Procacci admitted being in the vicinity of 21st Street and Palm Avenue on the afternoon in question, but claimed to be visiting a Tony Benedetto who operated a barber shop in the vicinity. He denied getting into a Lincoln car with anyone, and denied talking to appellant or anyone in a yellow 1956 Mercury with a Continental kit. Procacci also stated that immediately after he left the barber shop he visited one of his slaughterers, the firm of Loeb and Gottfried, and then went to visit a Mary Monahan until more or less seven o'clock and that it was dark at that time. He further stated he wanted to talk with appellant and made two short visits to the Deluxe Dog Food Factory that night. Also, he denied he saw Riggs there that evening.

"Appellant then took the stand and testified he knew defendant Procacci, but had not seen him for three or four weeks and did not talk with him at any time January 25, 1957. Appellant also denied seeing the truck parked near his plant. *Appellant denied having any interest in the Bee Fee Dog Food Company or the truck.* Appellant further testified he was home from 2:00 P.M. until 5:30 P.M., at which time he went straight from his house to the plant.

"Appellant also testified he arrived at the plant around 6:30 P.M. and did not leave until 9:00 P.M. He denied seeing or talking to defendant Procacci that day. Appellant also denied that defendant Zambotti was present at the Deluxe Dog Food Plant during the period from 6:30 P.M. to 9:00 P.M., and that he did not see him at any time when appellant was at the Deluxe Dog Food Plant. *Appellant did admit Zambotti had worked for him for about two years,* but denied seeing the truck pull out ahead of him from the Deluxe Dog Food Plant."

In response to the appellant's motion for a bill of particulars, the Government had set forth the manner in which it claimed that the appellant was connected with the conspiracy, as follows:

"1. In regard to William Dennis Riggs, the Government will attempt to prove that on January 25, 1957, said defendant was the driver of a 1956 yellow Mercury Convertible automobile which was used as a convoy car to aid and abet in the transportation of illicit whiskey.

"2. That the said William Dennis Riggs conspired with the other defendants by agreeing and allowing them to use premises owned by him in Hialeah, Florida, known as the Deluxe Dog Food Company for the storage and distribution of illicit whiskey."

Thus, two material objects, the yellow Mercury automobile and the Deluxe Dog Food Company plant, constitute the connecting links by which the Government sought to fasten the appellant to the conspiracy. The evidence does not show that the appellant owned or had any connection with the Bee Fee Dog Food Company. There was no substantial evidence that appellant owned the truck driven by

Zambotti and found to be loaded with fifty-seven 5-gallon cans of cold moonshine whiskey. Zambotti's statement to that effect when he was arrested was not made in the presence of the appellant and cannot be the means of proving existence of the conspiracy. Montford v. United States, 5 Cir., 1952, 200 F.2d 759. The appellant at the time of his arrest and consistently thereafter denied ownership of or any connection with the truck, and the Government offered no evidence to show that the appellant owned the truck, except Zambotti's hearsay statement. The fact that Zambotti worked for the appellant in the Deluxe Dog Food business was not enough to connect the appellant with Zambotti's act in driving a truck loaded with moonshine whiskey. Indeed, no sufficient reason appears why the Government should not be confined to the bill of particulars which it furnished,[1] and appellant's alleged ownership of the truck, or his employment of Zambotti were not referred to in that bill of particulars.

As to the yellow Mercury automobile, there is nothing but conjecture or surmise to identify appellant's automobile with the one at the corner of 21st Street and Palm Avenue at around 4:30 or 5:00 P.M., nor with the one which was at the Deluxe Dog Food plant between 6:15 and 7:00 P.M. There was no proof whatever that on either of those occasions the appellant was driving or occupying the Mercury automobile which was then present.

The appellant admitted that he and his yellow Mercury automobile were at the Deluxe Dog Food plant from 6:30 P.M. to 9:00 P.M., immediately preceding his arrest. He explained, and supported his explanation by a medical report of Dr. Theodore Hirsch, that he had been in Hialeah Hospital being treated for severe burns for ten days and had left the hospital only that afternoon. The appellant admitted that he owned and operated the Deluxe Dog Food plant and had been in that business for about six years. The search of that plant had revealed no illicit still or liquors. The only evidence connecting that plant with the alleged conspiracy was the fact that its premises were probably used on January 25, 1957, for the distribution of illicit liquor from one truck or car to another, or possibly from the refrigerator in the plant to a truck or car. Just where the illicit liquor may have been cooled rests entirely on conjecture. Assuming, however, that it was cooled in the refrigerator at the Deluxe Dog Food plant, that would have been during the appellant's confinement in Hialeah Hospital and its removal would have preceded or been coincident with his return to the plant. Such is the hard core of proven facts from which the appellant's connection with the conspiracy can be inferred.

On that state of the evidence, what are the functions and duties of the district court on motion for judgment of acquittal, and of this Court of Appeals on review? Clearly, neither Court is to re-try the case, or simply to substitute its judgment as to guilt or innocence for that of the jury.[2] The Court's function, so it has been said, is to find whether or not, taking the view most favorable to the Government, there is substantial evidence to support a verdict of guilty.[3] In applying that rule, however, it is vital to keep in mind its exact meaning. "Substantial evidence * * * means such relevant evidence as a reasonable mind might accept as adequate to support a

1. See United States v. Neff, 3 Cir., 1954, 212 F.2d 297, 309.

2. Pierce v. United States, 1920, 252 U.S. 239, 251–252, 40 S.Ct. 205, 64 L.Ed. 542; Matthews v. United States, 8 Cir., 1911, 192 F. 490, 495; Looker v. United States, 2 Cir., 1917, 240 F. 932, 933; Felder v. United States, 2 Cir., 1925, 9 F.2d 872, 875; United States v. Ginsburg, 7 Cir., 1938, 96 F.2d 882, 886.

3. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Lloyd v. United States, 5 Cir., 1955, 226 F.2d 9, 13; Badon v. United States, 5 Cir., 1959, 269 F.2d 75, 79.

conclusion." [4] The "conclusion" of a jury returning a verdict of guilty is that of guilt beyond a reasonable doubt.

The Second Circuit speaking through Judge Learned Hand has declared that "the standard of evidence necessary to send a case to the jury is the same in both civil and criminal cases" and has "refused to distinguish between the evidence which would satisfy reasonable men, and the evidence which would satisfy reasonable men beyond a reasonable doubt." [5] At the same time, that Court conceded: "It is probable, whatever they say, that in their actual judgments the added gravity of the consequences often makes them more exacting." An earlier Second Circuit case had stated the rule as we understand it: " * * * a verdict of conviction, though resting on inferences of fact that the judges would not draw, is assailable in an appellate court, only by demonstrating that reasonable men could not, as matter of law, be convinced beyond a reasonable doubt." Fraina v. United States, 2 Cir., 1918, 255 F. 28, 35. Later cases from the Second Circuit have, however, firmly established the doctrine in that Circuit that the standard of evidence necessary to send a case to the jury is the same in both civil and criminal cases. As said, again by Judge Learned Hand, in United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503, 505: "The accused at bar do not argue that the evidence was not strong enough to support a verdict in a civil case, and it certainly was; that being true, our review ends." The question was further discussed at length by that Circuit in still later opinions, in United States v. Costello, 2 Cir., 1955, 221 F.2d 668, 671, in United States v. Gonzales Castro, 2 Cir., 1956, 228 F.2d 807, and in United States v. Masiello, 2 Cir., 1956, 235 F.2d 279. In powerful dissents in the last two cases, Judge Frank termed this ruling the "Second Circuit doctrine" (235 F.2d 288) to distinguish it from cases which he cited to show that a contrary doctrine prevailed in the Third, Fifth, Eighth, Ninth, Tenth, and District of Columbia Circuits. See footnote 4, 228 F.2d 809, and footnote 12, 235 F.2d 291. See also footnote 3, 221 F.2d 680. The better rule, we think, is that expressed by Judge Prettyman in a well-considered opinion:

"The functions of the jury include the determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts. It is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy. The critical point in this boundary is the existence or non-existence of a reasonable doubt as to guilt. If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." [6]

The Fifth Circuit is aligned with the humane views thus expressed by Judge Prettyman. The rule in this Circuit has been stated as follows:

"On a motion for judgment of acquittal the test is whether, taking the view most favorable to the Government, a reasonably-minded jury might accept the relevant evidence as adequate to support a conclusion of the defendant's guilt beyond a reasonable doubt." Lambert v.

---

4. Consolidated Edison Co. of New York v. National Labor Relations Board, 1938, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. While that was an administrative case, the rule stated is applicable as well to jury verdicts in criminal cases.

5. United States v. Feinberg, 2 Cir., 1944, 140 F.2d 592, 594, 154 A.L.R. 272.

6. Curley v. United States, 1947, 81 U.S. App.D.C. 389, 160 F.2d 229, 232.

United States, 5 Cir., 1958, 261 F.2d 799, 801.

The position of the Fifth Circuit becomes even clearer when we consider that, as a practical aid to its review of the sufficiency of the evidence to justify a finding of guilt beyond a reasonable doubt in circumstantial evidence cases, " * * * this court has without wavering declared that the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt, and equally without wavering has applied it." Panci v. United States, 1958, 256 F.2d 308, 312.[7]

The Government insists that the legal principle announced in the cases just cited has been rejected by the Supreme Court in the case of Holland v. United States, 1954, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150. However, this Court has ruled to the contrary in a case decided since the present case was argued and submitted. Cuthbert and Busby v. United States, 5 Cir., 1960, 278 F.2d 220. It was there pointed out that nothing said in the Holland case, or in the authorities cited in that case, is at all inconsistent with the test to be applied in circumstantial evidence cases on motion for judgment of acquittal and on review of the denial of such motion as to whether the inferences reasonably to be drawn from the evidence were not only consistent with guilt of the accused but inconsistent with every reasonable hypothesis of his innocence.

It seems to us that the Supreme Court itself is not in accord with the "Second Circuit doctrine" but is in accord with that prevailing in this Circuit and in other circuits. In Mortensen v. United States, 1944, 322 U.S. 369, 374, 64 S.Ct. 1037, 1040, 88 L.Ed. 1331, the Court said:

"But we have never hesitated to examine a record to determine whether there was any competent and substantial evidence fairly tending to support the verdict. Cf. Abrams v. United States, 250 U.S. 616, 619 [40 S.Ct. 17, 63 L.Ed. 1173]. Our examination of the record in this case convinces us that there was a complete lack of relevant evidence from which the jury could properly find or infer, *beyond a reasonable doubt*, that petitioners transported the girls in interstate commerce 'for the purpose of prostitution or debauchery' within the meaning of the Mann Act [18 U.S. C.A. § 2421 et seq.]." (Emphasis supplied.)

That the Mortensen case was meant to establish a rule different from the "Second Circuit doctrine" is made explicit by American Tobacco Co. v. United States, 1946, 328 U.S. 781, 787, note 4, 66 S.Ct. 1125, 1128, 90 L.Ed. 1575, where it is said:

"The verdict in a criminal case is sustained only when there is 'relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt,' that the accused is guilty. Mortensen v. United States, 322 U.S. 369, 374 [64 S. Ct. 1037, 88 L.Ed. 1331]."

■ The evidence of guilt in the present case simply does not measure up to that high standard. The judgment must therefore be reversed. Instead of accompanying such reversal with directions to acquit, the cause is remanded so that a re-trial may be had, if the Government can produce additional evidence which, in the opinion of the district court, will warrant a re-trial of the case. See Bryan v. United States, 1950, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335; Sapir v. United States, 1955, 348 U.S. 373, 75 S.Ct. 422, 99 L. Ed. 426.

Reversed and remanded.

7. See also, Kassin v. United States, 5 Cir., 1937, 87 F.2d 183, 184; Rent v. United States, 5 Cir., 1954, 209 F.2d 893, 899; McTyre v. United States, 5 Cir., 1954, 213 F.2d 65, 67; Vick v. United States, 5 Cir., 1954, 216 F.2d 228, 232, 233; De Luna v. United States, 5 Cir., 1956, 228 F.2d 114, 115; Rodriguez v. United States, 5 Cir., 1956, 232 F.2d 819, 821.