Leon **BEARDEN**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 19325.

United States Court of Appeals
Fifth Circuit.

June 14, 1962.

Rehearing Denied July 17, 1962.

Robert S. Pine, El Paso, Tex., for appellant.

Frederick J. Morton, Asst. U. S. Atty., El Paso, Tex., Ernest Morgan, U. S. Atty., San Antonio, Tex., M. H. Raney, Asst. U. S. Atty., El Paso, Tex., for appellee.

Before HUTCHESON, RIVES and BELL, Circuit Judges.

JOSEPH C. HUTCHESON, Jr., Circuit Judge.

Appellant, pleading not guilty, was tried before a jury on Counts One, Three and Six on a six-count indictment, the remaining counts having been dismissed. Count One charged appellant with having knowingly transported "in interstate commerce * * * [certain persons] whom he had unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted and carried away and held for the purpose of stealing an aircraft and transporting it to the Republic of Cuba and for the further purpose of securing the [his] transportation to the Republic of Cuba", in violation of 18 U.S.C. § 1201. Count Three charged that appellant "transported and caused to be transported, in interstate commerce, an aircraft * * *", knowing it to have been stolen, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 2312. The sixth count charged appellant with obstruction of and attempt to obstruct commerce by extortion, in violation of 18 U.S.C. § 1951.

The jury found appellant guilty on each count, and he was sentenced to imprisonment for life on the first count, for five years on the third count, and for twenty years on the sixth count, all sentences to run concurrently. This appeal in forma pauperis followed.

The facts of the case are bizarre. On August 3, 1961, appellant and his son boarded a Continental Airlines Boeing 707 aircraft in Phoenix, Arizona. Each had purchased a ticket to El Paso, Texas, under an assumed name. The flight had originated in Los Angeles, California and was scheduled to proceed to Houston, Texas, with intermediate stops in Phoenix, El Paso, and San Antonio, Texas. While the airplane was in flight over the state of New Mexico, en route to El Paso, appellant and son, with pistols brandished, announced to the pilot and crew that they were taking command of the aircraft, ordered the pilot to make a

forty-five degree right turn (which would have placed the plane across the immediately adjacent Mexican border), and declared it to be their intention to take the aircraft and its passengers to Mexico, and from thence to Cuba.[1] There is evidence in the record indicating that a slight turn was perhaps made, but in any event the normal course was almost immediately resumed. The crew was able to convince appellant that the amount of fuel aboard was insufficient to permit a safe flight to Monterrey, Mexico, so he permitted the flight to proceed to El Paso, with the intention of refueling there and then proceeding to Cuba. While the aircraft was still in flight, ground authorities were made aware of the situation aboard it by radio. After a landing at El Paso was accomplished, refueling operations were purposely delayed at the direction of law enforcement authorities; during the period of delay, the crew members were held aboard the plane at pistol point, as hostages, although appellant allowed most of the passengers to deplane. Climatically, appellant order a takeoff notwithstanding the incomplete fueling operations, only to have his escape aborted when a fusillade of bullets, fired by police officers who were pursuing the departing aircraft down the runway in automobiles, pierced its tires and engines. Subsequently, several officers boarded the plane to negotiate with appellant for his surrender, the crew escaped, and appellant was subdued by force. All of the events above described were given widespread local and national television, radio, and newspaper coverage. Television and radio broadcasts covering the events subsequent to landing emanated directly from the airport, upon which many local residents, attracted by the television and radio reports, converged to witness the events in person.

Error is first assigned to the refusal of the trial court to grant a change of venue, requested on the ground that the dis-

1. Appellant's son, Cody Bearden, pleaded guilty to interstate transportation of a stolen aircraft, 18 U.S.C. § 2312, and ob-

struction of interstate commerce, 18 U.S.C. § 1951, pursuant to the Juvenile Delinquency Act, 18 U.S.C. § 5031 et seq.

semination by the news media of publicity regarding appellant's activities was so widespread as to preclude the possibility of obtaining a fair trial in the El Paso division of the Western District of Texas.

■■ The trial judge properly concluded that the mere existence of widespread publicity is not, in and of itself, sufficient to require a change of venue, but that the determinative factor is whether a jury which can reach a verdict uninfluenced by such publicity may be selected in the area. The prospective jurors were carefully examined by the trial judge. This examination revealed that most, if not all, of the jury panel had viewed the events which took place at the airport, either in person or by means of television coverage. Of two jurors who had actually been present at the airport, one stated that he would nonetheless be able to return a verdict based on the evidence and the law, while the other was excused because of the fixed opinion he had formed. Two television viewers were likewise excused. The remainder of the jurors on the panel indicated that they could reach a verdict on the evidence and the law. The record does not reveal, nor does appellant claim, that an objectionable juror was seated. The discretion of the trial court, to which the motion for change of venue is directed, was not abused in the case at bar, but was carefully exercised with the utmost regard for the interests of the appellant.

At the close of the government's case, and later, at the close of the entire case, appellant moved for a judgment of acquittal on all three counts, on the ground that there was no evidence, or alternatively, that the evidence was insufficient as a matter of law, to support convictions on those counts. Both motions were overruled. While appellant assigns error to the action of the trial court with respect to all three counts, serious objection is levelled only at the denial of the motion as to the first count.

Appellant first directs our attention to the fact that the indictment, in the first count, charged that appellant "did knowingly *transport* * * *", while the third count charged that he "transported and *caused to be transported* * * *", and the sixth alleged that he "did obstruct and *attempt to obstruct* * * *". The significance which is supposedly to be drawn from the difference in the language used in the several counts is that while the third and sixth allege that he "caused to be transported" and "attempted to obstruct", the first alleges neither that he caused the transportation of the named individuals, nor that he attempted to transport them. Thus, it is contended, he is charged in the first count flatly and solely with "transporting", and the evidence does not show that he transported anyone.

■ The first count was couched in the language of 18 U.S.C. § 1201.[2] The third incorporated the language of both 18 U.S.C. § 2312[3] and 18 U.S.C. § 2.[4] As the Reviser's Note to the latter section indicates, " * * * Section 2(b) is added to permit the deletion from many sections throughout the revision of such phrases as 'causes or procures' * * *." Similarly, the Reviser's Note to 18 U.S.C. § 1201 states that " * * * Reference to persons aiding, abetting, or causing was omitted as unnecessary be-

2. "(a) Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall be punished * * *."

3. "Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined * * * or imprisoned * * *."

4. "(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

cause such persons are made principals by section 22 [sic] of this title.", and the Note to 18 U.S.C. § 2312 stated that "* *. * Reference to persons causing or procuring was omitted as unnecessary in view of definition of 'principal' in section 2 of this title." It is thus apparent that the allegations in the third count, that appellant *caused* to be transported, was wholly superfluous, and that the difference in the language used in the first and third counts was immaterial. Appellant could have been convicted of the offense alleged in the first count as well upon proof that he caused transportation of the named victims as that he actually transported them himself, regardless of the presence or absence of the word "caused" in the count. See Pereira v. United States, 202 F.2d 830 (5th Cir., 1953), and authorities there cited.

Turning to the question of sufficiency of the evidence to sustain the conviction, it appears that the case at bar is one of first impression, in two repects: it is the only one we have been able to discover wherein the transportation of unlawfully seized victims was accomplished by means of an aircraft, and it is likewise the only one we have found in which the unlawfully seized victims were transported to precisely that place which would have been their destination even in the absence of transportation by their kidnaper. We have concluded that neither of these novel circumstances takes the case outside the purview of the statute.

The act prohibited by section 1201 is not, and indeed probably could not constitutionally be, unlawful seizure, etc. alone. What is prohibited is the knowing transportation of persons who have theretofore been "unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away and held for ransom or reward or otherwise." On the evidence in this record, there can be no doubt at all that the individuals named in the first count, the Captain, First Officer, and Second Officer of the aircraft, fell within the category of persons unlawfully seized and confined, beginning at the moment appellant appeared in the cockpit, aimed a pistol at them, and assumed command. The only remaining question, therefore, is whether they were transported by appellant in interstate commerce. We likewise have no doubt that they were. From the instant that appellant assumed command, acts performed by the plane's officers were not volitional as to them, but were the results of the will of the appellant: at that point in time, the former character of a routine air voyage under the exclusive control of the crew was terminated by appellant's act. A new aspect was taken on. That aspect may be characterized as "transportation" by appellant, within the meaning of the statute. It matters not that at a time prior to their seizure and confinement by appellant his victims had fully intended to proceed to El Paso, the place that ultimately proved to also be appellant's amended choice. For at that earlier time their intentions were formed with regard to circumstances existing at that time. With their seizure by appellant, however, the former intentions of the three officers were rendered totally ineffectual. Thereafter, it was solely the intention of appellant which controlled the course of the aircraft—it was *his* decision to proceed to El Paso which resulted in the later landing there. Nor is it important that it was not appellant himself who had his hand upon the controls of the craft. It was his will which in fact controlled its movement through the air. In this respect, the facts of the case at bar are no different in their legal effect than those presented to the courts in Brooks v. United States, 199 F.2d 337 (4th Cir., 1952); United States v. McGrady, 191 F.2d 336, 829 (7th Cir., 1951), cert. denied. Paulding v. United States, 342 U.S. 911, 72 S.Ct. 305, 96 L.Ed. 681; or Wheatley v. United States, 159 F.2d 599 (4th Cir., 1946). Moreover, were we to approach the case from the view that appellant "caused" the pilot of the aircraft to transport himself and the other victims, we would reach the same result. See United States v. Leggett, 269 F.2d 35 (7th Cir., 1959),

cert. denied 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed.2d 156, reh. denied 361 U.S. 941, 80 S.Ct. 367, 4 L.Ed.2d 361; Pereira v. United States, supra.

█ A reasonable minded jury might properly have accepted, and in the case at bar properly did accept, the relevant evidence presented to it as adequate to support the conclusion that appellant was guilty of each of the offenses for which he was tried. The motions for judgment of acquittal were, therefore, properly denied. Riggs v. United States, 280 F.2d 949 (5th Cir., 1960).

The judgment is

Affirmed.

RIVES, Circuit Judge (dissenting).

Two fundamental propositions peculiar to federal criminal law should be kept in mind: "First, there are no common law offenses against the United States and therefore the only federal crimes are those explicitly prescribed by Congress. Second, criminal statutes must be strictly construed; 'crimes do not arise by implication.'" 1 Moore's Federal Practice, 2d ed., § 0.323[5], p. 3734.

At common law an attempt to commit a felony is an indictable offense separate and distinct from the felony itself. 22 C.J.S. Criminal Law § 74. Some federal criminal statutes provide for the punishment of attempts to commit specific crimes. See United States v. Coplon, 2 Cir., 1950, 185 F.2d 629, 633; United States v. Baker, S.D.Calif.1955, 129 F. Supp. 684, 685; United States v. Robles, N.D.Calif.1960, 185 F.Supp. 82, 85. An attempt to commit the offense of kidnapping is indictable under some statutes. 51 C.J.S. Kidnapping § 2. I find no federal statute making criminal an attempt to commit any offense against the United States generally. That there is no such statute is indicated by the provisions of Rule 31(c) of the Federal Rules of Criminal Procedure, 18 U.S. C.A.: "The defendant may be found guilty * * * of an attempt to commit either the offense charged or an offense

necessarily included therein *if the attempt is an offense."* (Emphasis supplied.) In cases where two or more persons are involved much the same field is covered by the general conspiracy statute, 18 U.S.C.A. § 371, making it a criminal offense to conspire to commit any offense against the United States. The first count of the indictment charged a violation of the federal kidnapping statute, 18 U.S.C.A. § 1201:

"§ 1201. *Transportation*

"(a) Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed.

"(b) The failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce.

"(c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished as provided in subsection (a)."

It will be noted that that statute does not make criminal an attempt as such, though subdivision (c) does cover a conspiracy to violate the section. The first count, however, charges the commission of the substantive offense, and the conspiracy is a separate crime, which must be separately charged. United States v. Olmstead, D.C.W.D.Wash.1925, 5 F.2d 712, 714, 715; 15 C.J.S. Conspiracy § 80.

The verdict of guilty under the first count can be sustained only if there is relevant evidence from which the jury could properly find or infer *beyond a reasonable doubt* that "Leon Bearden did knowingly transport in interstate commerce" from New Mexico to El Paso the three named persons. American Tobacco Co. v. United States, 1946, 328 U.S. 781, 787, n. 4, 66 S.Ct. 1125, 90 L.Ed. 1575; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949, 955. Actually the plane proceeded on its regularly scheduled flight, leaving Phoenix, Arizona, at 1:00 A.M. and arriving nonstop at El Paso, Texas, at 2:05 A.M. The captain testified that the plane continued on its course. (R. 241) First Officer Wagner testified that he veered the plane.

"Q. Well, how much? Did you vary it as much as one degree?

"A. Well, more than one degree.

"Q. For how long?

"A. I have no idea how much I turned it.

"Q. For a few seconds?

"A. Yes.

"Q. And then got it right back on its course, isn't that right?

"A. No, it took it off its course.

"Q. For how long?

"A. I have no idea.

"Q. Well, to be fair about it, it was a matter of a very few seconds or a minute at the most?

"A. The airplane turns three degrees per second on a standard right turn, so in thirty seconds it could turn quite a distance.

"Q. All right. Let me ask you this, according to your schedule, of course, you take off from Phoenix on this flight about one o'clock or thereabouts?

"A. Yes.

"Q. And you did that in this case, did you not?

"A. Well, we may have been slightly delayed, I think we were a few minutes late.

"Q. All right. But, as a matter of fact, you arrived in El Paso earlier than scheduled, did you not?

"A. Yes, sir, this is normal because we usually have tail winds on an east flight."

That was the strongest testimony [1] introduced by the Government tending to show that the defendant's bizarre conduct ever influenced the course of the plane.

In its ordinary meaning, to "transport" means to carry or convey from one place to another. The word has been defined innumerable times, and often in connection with federal statutes. See 42 Words & Phrases, perm. ed., pp. 512–537, and pocket supplement. The net effect of all the evidence is that Leon Bearden was himself transported, not that he transported the three persons named in the first count. He was outwitted into believing that he had command of the plane, but actually, if the plane responded at all to his command, it veered but slightly and for a few seconds, an utterly immaterial response. In my opinion there was literally no evidence from which the jury could properly find that Bearden transported anyone.

The only precedents which the Government has cited are Brooks v. United States, 4 Cir., 1952, 199 F.2d 336, and Wheatley v. United States, 4 Cir., 1946, 159 F.2d 599, and my brothers have added United States v. McGrady, 7 Cir., 1951, 191 F.2d 829. In the Brooks case, Chief Judge Parker stated:

"The evidence established without contradiction that appellants, who were members of the Ku Klux Klan, disguised themselves in the regalia of the Klan and seized a man and

---

1. Other than the defendant's own braggadocio conclusion:

"Q. Now, Mr. Bearden, you do not deny here before this Court and jury that you did take this plane over?

"A. I don't think there is any doubt in anyone's mind in this court, Mr. Fuller, but what I assumed command of that plane, yes."

woman at the woman's residence in North Carolina, forcibly carried them to a lonely spot in South Carolina where they were given a flogging and told to stop living together and making liquor and to attend church." (199 F.2d at p. 336.)

In the Wheatley case, Judge Soper stated:

"There was evidence tending to show that the offense was committed in the following manner: On Sunday evening, May 26, 1946, at dusk the defendant, an elderly man, met Wilson in Newell at the place of a mutual acquaintance, and it was arranged that the defendant should ride with Wilson to the bridge across the Ohio River which connects Newell, West Virginia, with East Liverpool, Ohio. The defendant got in the front seat of the car with Wilson who drove towards the bridge. Before reaching it they arrived at a point near Wilson's home, and he slowed down and said he was not going any further. Thereupon the defendant pulled a knife from under his coat and stuck the point against the ribs of Wilson and ordered him to go across the bridge and then to a point near the defendant's home. The defendant, however, paid the toll on the bridge and when he got out of the car he threw a quarter on the seat to pay Wilson's toll on the return trip." (159 F.2d at p. 601.)

In the McGrady case, Judge Kerner said:

"The evidence so adduced overwhelmingly established that while Phelps' automobile was parked in a schoolhouse yard near Manhattan, Indiana, defendants, escapees of an Indiana penal institution, dressed in blue overalls and khaki shirts, approached the automobile in which Phelps and Miss Tucker were sitting. Paulding carried a rock. He demanded that Phelps drive him and the other two defendants into Illinois. The defendants entered the automobile. McGrady sat in the front seat with Phelps and Miss Tucker, and placed his hand over her mouth to prevent her from screaming. Paulding and Brown sat in the back seat, and Brown held Miss Tucker. One of the defendants told Phelps that they had knives and there was no use for him to try to fight. Thereupon Phelps drove his automobile with Miss Tucker and the defendants to a place near Paris, Illinois." (191 F.2d at pp. 830, 831.)

It is clear that not one of the three cases supports the Government's contention in the present case that Bearden transported the three alleged kidnappees in interstate commerce.

If, however, we consider arguendo that there was some substantial evidence for the jury's consideration, then it was necessary that the jury be carefully and fully instructed as to the legal test of whether Bearden did transport the three named persons in interstate commerce; e. g., that Bearden must be in command, or that the movement of the plane must be under his direction and control. Rule 52(b), Federal Rules of Criminal Procedure, places upon us the duty to notice plain errors affecting substantial rights though not brought to our attention by counsel. The rule was well stated for the D. C. Circuit by Judge Fahy in an opinion concurred in by Mr. Justice Burton, Retired:

"Counsel for the accused in neither the District Court nor in this court made any point of the omission. But the responsibility of instructing the jury upon the essential elements of a crime rests upon the court. Failure to meet this special responsibility of the court itself need not be overlooked by an appellate court because overlooked by counsel.

" 'It is true that no exception was taken to the trial court's charge. Normally we would under those circumstances not take note of the error. See Johnson v. United States, 318 U.S. 189, 200 [63 S.Ct. 549, 87

L.Ed. 704]. But there are exceptions to that rule. United States v. Atkinson, 297 U.S. 157, 160 [56 S.Ct. 391, 80 L.Ed. 555]; Clyatt v. United States, 197 U.S. 207, 221–222 [25 S.Ct. 429; 49 L.Ed. 726]. And where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion. Even those guilty of the most heinous offenses are entitled to a fair trial. Whatever the degree of guilt, those charged with a federal crime are entitled to be tried by the standards of guilt which Congress has prescribed.'

Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495. (Opinion of Mr. Justice Douglas, in which Mr. Chief Justice Stone and Justices Black and Reed concurred. The other opinions in the case did not question the principle above stated but dealt with other features of the case.)"

Barry v. United States, D.C.Cir., 1961, 109 U.S.App.D.C. 301, 287 F.2d 340, 341. See also United States v. Stone, 2 Cir., 1960, 282 F.2d 547, 550; Jonson v. United States, 9 Cir., 1960, 281 F.2d 884, 887; Barfield v. United States, 5 Cir., 1956, 229 F.2d 936, 941; Schino v. United States, 9 Cir., 1954, 209 F.2d 67, 74, 75; Tatum v. United States, D.C.Cir., 1951, 88 U.S.App.D.C. 386, 190 F.2d 612, 615.

Search the charge of the court (R. 499–512) as often as one may, there will not be found any explanatory instruction on that essential element of the crime. As close as the court came was to read the kidnapping statute, 18 U.S.C.A. § 1201, and then announce, "Now that is the law covering Count One of this indictment." The failure to go further and instruct the jury on the essential element of the crime as to which the evidence was, at best, weak, was such plain error affecting substantial rights of the defendant as to require a reversal.

The third count, under 18 U.S.C.A. § 2312, charged that Bearden "transported and caused to be transported in interstate commerce an aircraft, etc.," knowing that it had been stolen. The same errors that require a reversal of the judgment of conviction under the first count infect the conviction under the third count.

There is better ground to sustain the judgment of conviction under the sixth count of the complaint based upon 18 U.S.C.A. § 1951. That count charged that Bearden "did obstruct and *attempt* to obstruct commerce by extortion, etc.," (Emphasis supplied.) Even as to that count, however, I would reverse for a new trial because it seems to me that there are errors in the court's charge, highly prejudicial on their face. Cf. Logan v. United States, 5 Cir., 1951, 192 F.2d 388, 389.

Cody Bearden, the sixteen-year-old son of Leon Bearden, was arraigned in the presence of the jury and pleaded guilty as a juvenile delinquent. In its oral charge to the jury in Leon Bearden's case, the court said: "The son, Cody Bearden, has entered a plea of guilty to an information filed by the United States Attorney." There was no cautionary instruction not to consider the son's plea of guilty in arriving at the guilt or innocence of the father. If there had been any possible chance for an acquittal of the father, it disappeared when the court referred to the son's plea of guilty. As we said under less prejudicial circumstances,

> "When appellant chose to exercise his constitutional right of pleading not guilty, after his fourteen co-defendants had entered pleas of guilty, only the utmost care and caution on the part of Government counsel and of the court could assure him a fair and impartial trial." Scarborough v. United States, 5 Cir., 1956, 232 F.2d 412, 414.

The district court further instructed the jury:

> "You are instructed that although the Congress of the United States

has, since this alleged incident, passed what is known as the 'Hijacking Statute' further amplifying the present law and increasing the penalties, you will not give any consideration to that law because it has been passed since this offense occurred."

The Act referred to is Public Law 87–197, 75 Stat. 466, 49 U.S.C.A. §§ 1301, 1472, 1473, 1511, approved September 5, 1961, defining "aircraft piracy" and making it punishable by death or by imprisonment for not less than twenty years. One of the sections of that Act would clearly cover conduct like that of Leon Bearden in the present case:

" 'INTERFERENCE WITH FLIGHT CREW MEMBERS OR FLIGHT ATTENDANTS

" '(j) Whoever, while aboard an aircraft in flight in air commerce, assaults, intimidates, or threatens any flight crew member or flight attendant (including any steward or stewardess) of such aircraft, so as to interfere with the performance by such member or attendant of his duties or lessen the ability of such member or attendant to perform his duties, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both. Whoever in the commission of any such act uses a deadly or dangerous weapon shall be imprisoned for any term of years or for life.' " U.S.Code Cong. and Admin.News '61, p. 520.

The history of the legislation as contained in the report of the House Committee on Interstate and Foreign Commerce shows that the statute arose from this very case:

"On July 28, after the hijacking of a commercial airliner, Administrator Halaby, in a letter to Congressman McCormack, suggested additional amendments to the Federal Aviation Act to make it a Federal crime to assault, threaten, intimidate, or interfere with a flight crew member, to prohibit the carrying of concealed weapons on aircraft in air transportation, and to treat hijacking of aircraft as equivalent to piracy on the high seas." U.S.Code Cong. and Admin. News '61, p. 2566.

The legislation was meant to fill "the gaps in existing law." If the present judgment is to be affirmed, then it would appear that there were no gaps to be filled.

I think that it was prejudicial for the district court to make any reference to that statute, and all the more prejudicial when the court referred to it as "increasing the penalties," which is not so if the statute were applied *ex post facto* to Bearden's conduct in the present case. See section (j), quoted supra.

Thus far, I have treated the case as if it were properly before us for disposition because I failed to protest at the time of oral argument. Further reflection, however, has convinced me that we should not proceed to a disposition of this appeal until Leon Bearden has been afforded the same right to have oral argument made in his behalf upon appeal as would be accorded to an appellant who had money enough to employ counsel and to pay his traveling expenses.

In accordance with the provisions of 28 U.S.C.A. § 1915, the district court entered an order allowing Leon Bearden to prosecute this appeal in forma pauperis. An attorney who resides in El Paso, Texas, was assigned as counsel to represent the appellant. The appeal was set for oral argument before the Court of Appeals in Houston, Texas, on April 9, 1962. The court-appointed counsel filed a brief on behalf of the appellant, but under date of March 26, 1962, addressed a letter to the Court advising that he could not be present to argue the appeal because of lack of funds:

"After being assigned to represent the above captioned Defendant, I made a trip to California and also spent three days in Phoenix, Arizona investigating the case. Under the circumstances, I do not feel that I can expend additional monies by ap-

pearing in Houston to argue this case on Appeal.

"Approximately three weeks ago I requested the United States Attorney to ascertain whether Government monies might be available to cover my transportation to Houston. I was notified last week that such money is unavailable and therefore, I will not be present to argue this Appeal when it is heard on April 9, 1962."

Accordingly, when the appeal came on for hearing on April 9, we heard oral argument (only for about fifteen minutes) from counsel for the United States, with the appellant absent in prison and his court-appointed counsel not present. That is not right.

In state criminal cases the Supreme Court has held that the guarantees of the Fourteenth Amendment require that "destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts." Griffin v. Illinois, 1956, 351 U.S. 12, 19, 76 S.Ct. 585, 100 L.Ed. 891; Eskridge v. Washington Prison Board, 1958, 357 U.S. 214, 216, 78 S.Ct. 1061, 2 L.Ed.2d 1269.

In Griffin v. Illinois, supra, in the opinion of Mr. Justice Black in which The Chief Justice, Mr. Justice Douglas and Mr. Justice Clark joined,[2] it was said:

"There is no meaningful distinction between a rule which would deny the poor the right to defend themselves in a trial court and one which effectively denies the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance. It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all. See, e. g., McKane v. Durston, 153 U.S. 684, 687–688 [14 S.Ct. 913, 38 L.Ed. 867.] But that

is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty. Appellate review has now become an integral part of the Illinois trial system for finally adjudicating the guilt or innocence of a defendant. Consequently at all stages of the proceedings the Due Process and Equal Protection Clauses protect persons like petitioners from invidious discriminations." 351 U.S. at p. 18, 76 S.Ct. 585, 100 L.Ed. 891.

If we substitute the due process clause of the Fifth Amendment for that of the Fourteenth, it seems to me that the reasoning applies with no less force to persons convicted of federal crimes. It is true of crimes against the United States that "appellate review has now become an integral part of the * * * trial system for finally adjudicating the guilt or innocence of a defendant." (351 U.S. at p. 18, 76 S.Ct. at p. 590)

It follows that the Sixth Amendment also applies to guarantee to the accused the right to assistance of counsel for his defense. Since Johnson v. United States, 1957, 352 U.S. 565, 566, 77 S.Ct. 550, 1 L.Ed.2d 593, it can no longer be doubted that on appeal in forma pauperis from a judgment of conviction, the Sixth Amendment requires that the defendant be given the assistance of counsel. See also Farley v. United States, 1957, 354 U.S. 521, 77 S.Ct. 1371, 1 L.Ed.2d 1529; Ellis v. United States, 1958, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed.2d 1060; Coppedge v. United States, 82 S.Ct. 917. Those comparatively recent decisions bear out the farsighted opinion of Judge Underwood in Reid v. Sanford, Warden, N.D. Ga., 1941, 42 F.Supp. 300, 303.[3]

"When petitioner was granted an appeal in forma pauperis, all subsequent necessary proceedings until

---

2. Mr. Justice Frankfurter wrote a separate concurring opinion, the other four Justices dissented.

3. See also Annotation, 55 A.L.R.2d 1085; Roger Bernhardt, Appellate Review for Indigent Criminal Defendants, University of Chicago Law Review. Vol. 26, p. 454.

542

final decision on appeal represented steps in the trial of the case at which he was entitled to counsel. The fact that the appeal in forma pauperis was allowed was a finding by the Court that the trial was not ended, but extended until final determination upon appeal."

As was said by Judge Hamley for the Ninth Circuit in Anderson v. Heinze, 1958, 258 F.2d 479, 481:

> "If this were an appeal from a conviction in federal court, there is no question but that Anderson would be entitled to such assistance as a matter of right. Johnson v. United States, 352 U.S. 565, 77 S.Ct. 550, 1 L.Ed.2d 593. The rationale of that decision is premised upon the fact that an appeal from a judgment of conviction is one step in the criminal proceedings. Since the Sixth Amendment entitles defendants in federal criminal proceedings to the aid of counsel (Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L. Ed. 1461), that right extends to every phase of the appeal, including the preliminary phase of obtaining permission to appeal in forma pauperis. See In re Dinerstein, 9 Cir., 258 F.2d 609; Gershon v. United States, 8 Cir., 243 F.2d 527, 530."

The importance of oral argument to the ultimate decision is well understood. Absence of counsel at that stage may be, and usually is, far more prejudicial than absence of counsel on arraignment. See Hamilton v. Alabama, 1961, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114. Poverty of the appellant was the sole reason that he was not represented by counsel on oral argument before this Court. In the present posture, I submit that we have no jurisdiction to proceed to a disposition of this appeal. Certainly, in my opinion, we should not do so until the appellant has been afforded the same right of oral argument upon appeal as would be accorded to an appellant who had money enough to employ counsel and to pay his traveling expenses.

Poetic justice may be achieved in meting out to Leon Bearden the same kind of treatment that a defendant could expect in Cuba. But our proud heritage guarantees to one guilty of the most opprobrious misconduct, or even of the most heinous crime, equal justice under the law. I know that the learned district judge and my brothers, for each of whom I have the highest respect and even affection, would accord Bearden no less. With deference, I differ with them in the application of those principles to the facts of this case. I dissent.

Rehearing Denied: RIVES, J., dissented.