Richard Dudley HELMS, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19774.

United States Court of Appeals
Fifth Circuit.

Oct. 30, 1962.

Rehearing Denied Nov. 26, 1962.

Ira De Ment, Montgomery, Ala., for appellant.

Ben Hardeman, U. S. Atty., J. O. Sentell, Asst. U. S. Atty., Montgomery, Ala., for appellee.

Before RIVES, JONES and BELL, Circuit Judges.

PER CURIAM.

The appellant was convicted of violating Section 2314 of Title 18 United States Code, by transporting or causing to be transported in interstate commerce with unlawful and fraudulent intent from Andalusia, Alabama, to Pensacola, Florida, a forged check drawn on the Florida National Bank, Pensacola, Florida, dated June 12, 1961, in the amount of $800.00, payable to Richard Dudley Helms and signed D. C. Henderson, knowing the same to have been forged. He was sentenced to imprisonment for eighteen months. On appeal, he urges five grounds for a reversal of the judgment of conviction.

The first is that the district court erred in denying the appellant's motion

for a judgment of acquittal. The principal insistence is that there was no sufficient evidence that the appellant knew that the check was falsely made or forged. The appellant did not testify in his own behalf. He had made voluntarily certain admissions to an agent of the FBI as follows:

"A. I showed him this check, and he—he examined it in his hand, and he admitted to me that he had on about the 13th or 14th of June taken this check for eight hundred dollars into the Commercial Bank in Andalusia, Alabama, and had opened an account and deposited this check in that bank in his name. He admitted that the handwriting, Richard D. Helms, eight hundred dollars, the date, the endorsement on the back, were all in his handwriting. He explained how he got the check in this manner; he said that the D. C. Henderson which is signed to the check is the name of a Dewey Henderson, who is his uncle, and I believe on his mother's side, that during the spring and summer of 1960 he and Henderson had a partnership, H and H Construction Company, and there may be a word or two in there that I don't recall, but that was the—that is the general name of the company. That they were engaged in Pensacola, Florida, and in that area, in construction of houses, but principally in making repairs, that sort of adding to and repairing houses, rather than making new houses, but anyway they were in that construction business, that during the spring or early summer of '60, because of some financial problem they had, Henderson had put some money in the Florida National Bank, which—at Pensacola, which is not the bank they had been banking with. I forget the name of that, something to do with Grace in the name, as I remember, but anyway, this was a different bank from where the partnership had been banking, that Henderson had made this deposit in this bank for the purpose of having money to operate their business. That since he—it was in Henderson's name, personally, and since he, Helms, was principally engaged in running their office, that from time to time his partner, Dewey Henderson, would sign two to three, four checks in blank and leave them there for him to meet current expenses, paying labor and things that they were buying and what not. He stated that in August of 1960 he left that business and left the community. He did not return until the—I believe it was the 23rd of May, '61. Anyway, it was late May of '61. That in the meantime Henderson had taken all the books of this company and had left them at Helms' father's house, which was located RFD Andalusia, it is down south of Andalusia. That after returning in late May of '61, he looked through these books and found three or four of these checks signed in blank, that this is one of the checks.

"Q. Signed how?

"A. Signed—he said that this signature, D. C. Henderson, on the bottom was already on these checks and nothing filled in. He didn't tell me what he did with the others, but as to this one check he said he took this check to Andalusia, went to the bank, and filled it out, himself. I don't know—I don't

recall where he filled it out, but he filled this out in his own handwriting. He did take it to the Commercial Bank in Andalusia. He did deposit it there. And that he later or subsequently wrote checks and cashed them on this account that he had opened with this check here. I asked him, and he—the specific question as to whether he had seen Henderson since he had returned to the area and prior to cashing or depositing this check, and he said he had, but he had not asked him whether or not he had any money in the bank, that he had no knowledge as to whether there was any money in the Florida National Bank."

The appellant's uncle Dewey C. Henderson denied that he had signed the check, had made out any part of it or had authorized anyone else to sign his name to the check. Dewey C. Henderson admitted that he was on five years probation after twenty-eight convictions for bad checks.

Henderson's testimony was corroborated to some extent by the testimony of a special agent of the FBI, a qualified handwriting expert, who compared the signature on the check with several signatures which Henderson gave at his request,[1] and reached the "firm conclusion" that Henderson did not sign the check. The agent further testified:

"Q. Now, did you reach the conclusion from—or from comparables that you have given the jury, did you reach a conclusion as to whether or not the same hand that wrote, 'D. C. Henderson,' here on the bottom line of Government's Exhibit number 9 made out the name, 'Richard D. Helms,' and wrote the word 'Hundred,' and the word, 'June,' in there on that Government's Exhibit number 9?

"A. Because of the lack of comparable letters, I could not reach a definite conclusion with that respect, because there was not sufficient comparable writing in the upper portion of the letter with some of the letters in the signature; however, as I pointed out, I found significant similarities in all the letters that were comparable; I found nothing to indicate that the writer on the basis of what I have here could not have written the signature.

"Q. Did you find any comparables that were—that were not alike?

"A. I have found nothing to indicate another person would have written it."

There was ample testimony that the appellant deposited the check in the Andalusia Bank and that there was no account in the Florida Bank in the name of D. C. Henderson. Circumstances in the appellant's favor are that, after depositing the check, he did not leave Andalusia, but made at least three telephone inquiries as to whether the check had cleared. The check took longer than usual to clear. The first telephone call from the appellant was "about a week or ten days after the deposit was made." The bank officer told him that "I thought it had been outstanding long enough to have cleared." After that conversation the bank charged a $75.00 check against the account. Earlier checks for $15.00, $25.00 and $10.00 had been charged against the deposit. Another $15.00 check was later paid. While the evidence is not conclusive, it made a case for the jury's consideration, and was sufficient to support the verdict of guilty. Riggs v. United States, 5 Cir., 1960, 280 F.2d 949.

1. The agent admitted on cross-examination that requested signatures are disapproved as samples for comparison by a standard recent text written by Ordway Hilton.

■ The second insistence on error is that the ledger card and the debit memorandum charging the unpaid check against the account were erroneously admitted in evidence over appellant's objection because not shown to have been made in the regular course of business at the time of the act as required by 28 U.S.C.A. § 1732. That objection was, we think, sufficiently met upon the examination of the bank's vice-president.

"MR. DEMENT [appellant's attorney]: Your honor, we move to exclude the Exhibits of the Government which were placed in evidence on the ground that the predicate laid by the District Attorney does not conform to the Federal Business Records Act.

"THE COURT: All of these records kept by the bank down there that you brought up here that the District Attorney has questioned you about, Mr. Simmons?

"WITNESS [Mr. Simmons]: Yes, sir.

"THE COURT: And are they kept in the regular course of business of the banking business by Commercial Bank there in Andalusia, Alabama?

"WITNESS: Yes, sir.

"THE COURT: Motion is overruled."

■ The third insistence on error relates to remarks made by the United States Attorney and the Assistant United States Attorney in their opening and closing arguments. No objection was made at the time, but the appellant urges that the remarks were plain error under Rule 52(b), Federal Rules of Criminal Procedure. The remarks were as follows:

"We don't have any handwriting specimens up here of Richard Dudley Helms to offer to you * * *

" * * * Oh, he said he found this check among some papers when he got back a year later. A year later he comes back there, and he finds this pad of things in his daddy's house. As far as his daddy being up here, the power of subpoena of this court, Mr. DeMent, runs for the defendant just like it does for the Federal Government, and if he hasn't got the money he can get them in here at the expense of the Federal Government, and nobody knows it better than this defendant and Mr. DeMent * * *

" * * * The—the evidence here is clear, it is convincing, it is all on one side, and none on the other, and I am sure you will let your verdict speak the truth. Thank you."

If there is any error in any of these arguments any injury could have been removed by timely objection. None of these arguments constitute plain error affecting substantial rights within Rule 52(b), Federal Rules of Criminal Procedure.

■ The fourth insistence on error is that there was a material variance between the pleading and the proof in that the indictment charged that the payee of the check was Richard Dudley Helms, whereas the check itself shows that the payee was Richard D. Helms. An FBI agent testified that appellant's middle name was "Dudley." There was no material variance. Nunnally v. United States, 5 Cir., 1961, 291 F.2d 205.

The fifth and last insistence is that the court had no right not to receive the verdict of not guilty first returned by the jury through error of their foreman signing that form of verdict rather than the form for a guilty verdict contained on the same mimeographed page. The following appears from the record to have occurred:

"THE COURT: All right, has this jury reached a verdict in the case?

"JUROR RALPH M. STANFORD: We have, your honor.

"THE COURT: Will you hand it to the Clerk, please. Read the verdict.

"THE CLERK: United States of America versus Richard Dudley Helms. We the jury find the defendant, Richard Dudley Helms, not guilty.

"ANOTHER JUROR: No.

"THE CLERK: This is the 15th day of April, 1962.

"(Other jurors talking, which comments were not audible to reporter)

"THE COURT: Just a minute; just a minute; just a minute.

"JUROR RALPH M. STANFORD: Your honor, we—

"THE COURT: Let me see the verdict. Did you sign the wrong one?

"JUROR RALPH M. STANFORD: Yes, sir.

"THE COURT: All right, take it back and re-deliberate.

"JUROR RALPH M. STANFORD: All right, sir.

"THE COURT: That is all right; it is easy to make that mistake on that form of verdict.

"ANOTHER JUROR: Do we need another form, or will that—

"THE COURT: No, you haven't used the other one; there is just one other—give them a new form. It will be filled out and sent to you. Go back in the jury room; take your other verdict with you, but bring it back, also.

"THE CLERK: Just fill out the bottom part?

"THE COURT: No, fill out both of them.

"(At which time the jury left the court room)

"MR. DEMENT: Your honor, I don't know what the law is, but I feel it is my duty to object to this, to preserve the record, in the event there is an appeal in this case, and I do object.

"THE COURT: And what is the basis for your objection?

"MR. DEMENT: On the ground that the verdict had been delivered to the Clerk by the Foreman and was in the process of being read by the Clerk.

"THE COURT: And it was read to the point—to the point that the Clerk read that it was a verdict of not guilty.

"MR. DEMENT: Yes, sir.

"THE COURT: Let's let the record reflect that the foreman at that time advised the court that he had signed the wrong form.

"MR. DEMENT: All right, sir. But I still object, if it please the court.

"THE COURT: All right. If the jury—if the jury intends to find your client, Helms, not guilty, I am going to give them every opportunity to do it, Mr. DeMent.

"MR. DEMENT: Yes, sir.

"THE COURT: But if it is their unanimous opinion that he is guilty, I am going to give them every opportunity to return that finding, too. My only interest is for them to return the finding that reflects the unanimous verdict of each member of that jury.

"MR. DEMENT: Judge, I know that, and I don't question that, but I felt that it was my duty to make that objection.

"THE COURT: All right, sir."

■ It seems to be settled in the federal courts that in the case of an inadvertent mistake the court has the power before finally accepting the verdict and discharging the jury to permit the jury to correct the mistake, as was done in this case. Shiflett v. Welch, 4 Cir., 1947, 161 F.2d 933; Bernhardt v. United States, 6 Cir., 1948, 169 F.2d 983, 984; Daigle v. United States, 1957, 101 U.S.App.D.C. 286, 248 F.2d 608. We find no reversible error in the record and the judgment is

Affirmed.