STATE OF WEST VIRGINIA

*v.*

ALEX DANDY

(No. 12573)

Submitted January 31, 1967.   Decided March 28, 1967.

BERRY, JUDGE, dissenting.

*Chester Lovett,* for plaintiff in error.

*C. Donald Robertson,* Attorney General, *Leo Catsonis,* Assistant Attorney General, for defendant in error.

BROWNING, JUDGE:

The defendant, Alex Dandy, was convicted in the Intermediate Court of Kanawha County, West Virginia, on March 19, 1965, of the offense of being an accessory before the fact in that he did feloniously counsel with, aid and abet one Ruth Maley to make or cause to be made false entries in written accounts kept by the state, and was sentenced to a term of from one to ten years in the penitentiary. A writ of error was refused by the Circuit Court of Kanawha County on November 16, 1965, to which this Court granted a writ of error and supersedeas on May 16, 1966. On the date the case was set for trial defendant filed a petition for a change of venue alleging that: as a result of defendant's long-time residence in Kanawha County he had become extremely well known; four indictments were returned against him in September, 1964, and a fifth was returned in 1965; prior to the return of these indictments many news items appeared in local newspapers and on television and radio stations giving headline coverage to the matters about

which the defendant was indicted and to the defendant himself; such publicity related in great part to the so-called "flood relief fraud cases" and "dummy corporations" and connected this defendant with such alleged cases; on March 8, 9, and 10, 1965, Ruth Maley, the alleged principal of the offense with which he was charged, was tried and convicted during the course of which trial publicity concerning the defendant was constantly "rehashed"; during the year 1964 defendant's brother, William Dandy, was charged with a crime in Kanawha County and after a mistrial the said William Dandy was granted a change of venue largely on the basis of his relationship to, and the reputation of, the defendant herein; in the four or five years preceding the indictment the defendant has been the subject of much ridicule concerning his alleged connection with a former governor and other high officials of the state; and, the people of Kanawha County have formed a general feeling of guilt and hostility toward the defendant and the defendant cannot receive a fair trial in Kanawha County.

In support of the petition there were attached approximately seventy-five newspaper items and editorials concerning the defendant. While it would serve no purpose to recount them all, the first exhibit appears on April 6, 1963, describing the defendant as a "mystery man" with high connections and influences with state officials. On September 11, 1963, as an outcome of the first trial of William Dandy, four Charleston policemen were removed from the police force and the defendant's name was given prominent display in the civil service appeal brought by them for reinstatement. Among other exhibits were: several stories relating to a time when the governor and the defendant were in Paris, France, at the same time; newspaper stories bearing captions as follows: on December 3, 1963, "Alex Dandy Lawsuit Tells of Liaison Efforts in W. Va."; December 4, 1963, "Dandy Suit Blamed, Firm Delaying State Location"; December 5, 1963, "Link With Dandy Denied By Trent"; Feb-

ruary 13, 1964, "Dandy, Plastic Firm Settle Suit"; April 17, 1964, "Alex Dandy's Head Injured"; August 6, 1964, "Bitter Dandy Is Leaving, Raps Press"; October 1, 1964, began the so-called flood relief probe by the grand jury which relates to the investigation of the Pioneer Construction Company, a corporation principally owned by the defendant. On October 15, 1964, indictments were returned, including those against the defendant, and in an accompanying news story the Paris "coincidence" was restated and contained the comments of the grand jury as to kickbacks and dummy corporations. Thereafter the newspaper articles and editorials appeared almost daily with some reference to the defendant; both political parties attributed various connections between the defendant and the opposing political candidates; libel suits were filed based on such allegations; a reward was offered for one John Stanton, a joint indictee of the defendant; and there was daily coverage of the Maley trial and constant references to the defendant herein were published.

In addition to these exhibits and in support of his petition for a change of venue the defendant called thirty-three witnesses, lawyers, businessmen, judges, etc., all of whom testified that the defendant's reputation was such that he could not obtain a fair trial in Kanawha County. In opposition to the motion the state called thirteen people, prominent in the community, who testified substantially to the contrary. The petition for a change of venue was overruled and the case proceeded to trial. Inasmuch as it is the view of this Court that the decisive issue upon which a determination of this case turns is the ruling of the trial court in denying the defendant a change of venue, it would serve no purpose to recite the evidence in the case and it is unnecessary, and perhaps inappropriate, to discuss the other assignments of error.

Article III, Section 14 of the constitution of this state provides, insofar as pertinent, that "Trials of

crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public, without unreasonable delay, and in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county. . . ." In its earliest decisions interpreting this section this Court held that only the defendant was entitled to have the situs of a trial removed from the county wherein the defendant was indicted and then only upon a showing by him of good cause. This is the third syllabus point of *State v. Greer,* 22 W. Va. 800: "The burden is on the prisoner to show to the satisfaction of the court, good cause to have the trial of the case removed; and such cause must exist at the time the application is made." In the *Greer* opinion the Court cited *Wormley's Case,* 10 Gratt. 658, and commented as follows: "The court of appeals held, that upon an application of a prisoner charged with murder for a change of venue his affidavit alone of his fear or belief, that he cannot obtain a fair trial in the county, is not sufficient to sustain the motion; but he should be required to show by independent and disinterested testimony such facts, *as make it appear probable, at least, that his fears and belief are well founded.* (Italics supplied.) But where such facts are shown by the prisoner and are not successfully repelled or explained by the commonwealth, no argument of inconvenience or delay should be permitted to stand in the way of the great end to be attained, a fair and impartial trial." This further statement is contained in the opinion of the *Greer* case: "While it is true that the witnesses, who testified that they believed the prisoner could have a fair and impartial trial, were more numerous than those who testified to the contrary belief, yet *their affidavits in many cases contain no reason for such belief.* Taking all the evidence and circumstances surrounding the case, it seems to us, the court erred in overruling the motion to change the venue. If the right secured to the citizens, amounts to anything, we can scarcely conceive

of a stronger case for its exercise than the case before us." (Italics supplied.)

There have been many decisions by this Court upon this issue, some sustaining the trial court and others reversing upon the ground that the trial court had abused its discretion. Some, but by no means all, of those decisions will be referred to hereinafter. However, at this point we believe it necessary, if this opinion is to serve its primary purpose, to recite at least a brief resume of the testimony of the principal witnesses for both the defendant and the state.

The following witnesses for the defendant after being qualified were all asked substantially the same question, that is, whether or not at that time the defendant Alex Dandy could obtain a fair trial in the Intermediate Court of Kanawha County upon the charges contained in the indictment relating to the so-called "flood relief fraud" cases. Therefore, the principal question will not be repeated as to each witness. Charles Hurt, a life-long resident of Kanawha County and a practicing attorney in the City of Charleston, replied to the principal question: "I don't believe he can." He then testified as follows: "Q. Why do you feel he can't get a fair trial by a jury in this Court? A. Because of the adverse publicity he has received in the last several years, the general consensus of opinion in the community. Q. What kind of publicity? A. Newspaper, television, radio. Q. And have you observed these newspaper articles and heard these television and radio publications or broadcasts? A. Yes. Q. Have you heard anyone else talk about these particular news items? A. Yes. Q. Concerning Alex Dandy? A. Yes, sir. Q. And for what period of time have you heard that? A. Several years. Q. Has there been any change in that up to and including the present date? A. No. sir." Upon cross-examination by the assistant prosecutor, Mr. Hurt then testified: "Q. And it is not your testimony before the Court here that you couldn't find twenty people in all of

Kanawha County that are of the age and qualification to sit as jurors, who would grant a fair and impartial trial? A. *Mr. Casey, I don't think you can find twenty people in Kanawha County that haven't a pre-conceived idea or opinion concerning the trial."* (Italics supplied.)

Cleo S. Jones, Assistant City Solicitor in charge of criminal cases for the City of Charleston, answered the principal question thus: "I find there is extensive prejudice or pre-judgment of Mr. Dandy as to his conduct in general, his reputation, I find it rather extensive, I find it has been for the past year or so extensively discussed among certain people; in fact, it is rather extensive through the people with whom I have talked. . . . It would be most difficult, or it would be difficult to get people that have not heard it discussed, and which, if they had, I would say it would be, it would influence their thinking toward Mr. Dandy, in my opinion." Upon cross-examination this witness was asked if he believed it would be impossible "that there could be a fair and impartial venire drawn in the citizens of Kanawha County," and he replied, in part, "I would say that it is very extensive, though, and among the general people that I have talked with in business circumstances, professional circumstances, that are more interested in talking about it, I would say from that group that I have talked with *you couldn't get twenty people,* of the general people I have talked with, that would be impartial—at least they have expressed preconceived ideas about it." (Italics supplied.)

Paul Friedberg, a practicing attorney of Kanawha County and resident of the City of Charleston, was interrogated as follows: "Q. Mr. Friedberg, do you know Alex Dandy? A. Yes. Q. How long have you known him? A. Approximately eight years. Q. Do you consider yourself a friend of Alex Dandy? A. No. Q. Do you dislike Alex Dandy? A. I think that is fair to say. Q. Are you here voluntarily, Mr. Friedberg?

A. No.'' In answer to the principal question he testified: ''I don't believe he can receive a fair trial in Kanawha County. Q. And why do you believe that? A. I think his reputation is such that people probably have a preconceived opinion about the man. Q. And how do you believe that that reputation came about? A. I think he probably brought it on himself.'' This is the first question asked by the prosecutor on cross-examination and the witness's answer: ''Q. Don't you believe out of the thousands of people of jury age and qualifications in Kanawha County, containing approximately one-sixth of the people in the State of West Virginia, that you could obtain twenty qualified and impartial jurors to give a fair trial in this case? A. *No, I don't believe you could.*'' (Italics supplied.)

M. C. Phillips, a restaurateur for many year in the City of Charleston, answered the general question thus: ''My personal opinion is that he cannot. . . . Due to the publicity that he has had over the past few years, and the number of people that I come in contact with and talk to daily, who have brought the subject up voluntarily, that have convicted him before he has had a trial, based upon what they have read, what they have heard, what somebody has told them. And I don't think you can pick a jury of twelve people, regardless of how hard they try, and I believe they are in earnest, when they try to say they are not opinionated, I don't see how you could, based upon what people have told me voluntarily without even being asked.''

W. W. Barron, immediate past Governor of the State of West Virginia, in addition to the principal question was asked these questions and gave these answers: ''Q. Do you consider yourself a close personal friend of Alex Dandy? A. No. Q. What do you consider your relationship with Alex Dandy as far as friendship is concerned, Mr. Barron? A. Well, I would say that we are not friends. Q. Are you here voluntarily, Governor, or are you here by subpoena?

A. I am here by subpoena." In answer to the principal question he stated: "I think there has been so much adverse publicity in the news media that as a result, public opinion is so strong against Dandy that he can't receive a fair trial." Upon cross-examination, replying to a question as to the impossibility of the defendant receiving a fair trial in Kanawha County, this witness stated: "I am not saying that it is absolutely impossible, I am saying *the probability is strong* that he could not receive a fair trial." (Italics supplied.)

John Reed, former Municipal Judge of the City of South Charleston and a practicing attorney in Kanawha County, answered the principal question thus: "It is my opinion that . . . he could not obtain. . . a trial, with the usual due processes of law—well, in any court in this county." He was then asked the following question and gave this answer: "Q. And why do you say that, what forms your opinion, John? A. There has been over months and years such a deluge of publicity involving Mr. Dandy and his family, other members of his family that it would—that—it is my opinion that even though—even though the—the jury, or any human being sitting in judgment, having heard all of that, would certainly have some underlying, subconscious opinions which they—which they couldn't extract themselves from even though they—even through they desired to do the fairest things on earth." Upon cross-examination this witness was asked if twenty unbiased and unprejudiced jurors couldn't be found from the two hundred fifty thousand people in Kanawha County and this was his answer: "Oh, I think perhaps if you combed the county and went through the two hundred and fifty thousand people you possibly might, *but from a practical standpoint and court procedure and the manner of drawing. . . it is my opinion, no.*" (Italics supplied.)

William Copper, who operates a drug store in the east end of Charleston and resides in South Charleston, testified as follows: "A. I don't believe so, no.

Q. You don't believe what? A. That he could have a fair trial, too much has been said about him, you read too much in the newspapers, hear it on the radio, hear it on television, and in contact with people day in and day out, mention is made of this particular thing, especially up where I am, up in my particular neighborhood. Q. What is your particular neighborhood, Mr. Copper? A. The 1700 block of Washington Street, East, which is across from the Capitol."

Kenneth Kurtz, news director for WSAZ-TV in Charleston, who stated that "We cover almost all of the southern part of West Virginia, and other parts of the state.", testified as follows: "Q. That would include all of Kanawha County, of course? A. Yes. . . . Q. Ken, in the last four or five years, has the name Alex Dandy been very much in the news? A. Yes. Q. Would you say considerably, would you say slight, or average; or what would you say? A. Well, I would have to say considerable coverage, certainly not on the level with the top newsmakers as we consider them, the Mayor, the Governor, and so on and so forth; but far more than an average office holder in the county. . . . Q. To your knowledge, he is not an office holder? A. No, sir. . . . Q. Ken, do you believe that Mr. Dandy can get a fair trial in Kanawha County? A. I do not think that it would be impossible; I do feel it would be difficult. Q. Do you think it would be improbable, rather than impossible? A. Improbable." Upon cross-examination this witness stated: "I think it's possible to find sufficient people who would give Mr. Dandy a fair trial, but I think it would be difficult."

Obidiah Chandler, a funeral director and life-long resident of Kanawha County, answered the principal question thus: "I should think from the information that has been in the papers, the television and radio, and barber shops and so forth, in my honest opinion, I don't believe he could." On cross-examination, this witness further stated: "If the jurors are hand

picked, which it isn't done, there may be that possibility; but the way jurors are selected, I don't believe so."

John Charnock, Jr., Clerk of the Municipal Court of the City of Charleston, and sometimes acting judge of that court, answered the general question flatly: "In my opinion he cannot." He was asked this further question and gave the following answer: "Q. And why do you say that he cannot, John? A. In my opinion, it boils down to a matter of his reputation, the way his reputation is received over the county."

Timothy M. Barber, a practicing attorney in Charleston and St. Albans, testified as follows: "My opinion is he cannot get a fair trial in Kanawha County. Q. Why do you think he can't? A. It is my opinion his name is so well known in Kanawha County, and well known in the line of being infamous or in a degrading way, that the citizens that would be drawn on the jury panel in Kanawha County would be familiar with his infamy and would be unable to assess his guilt or innocence impartially like they should. I think—I don't know where his infamy arises from, whether his own doing, but it has been reported in the newspapers extensively. I am a lawyer, I deal with lawyers generally and clients, but I don't really know of anybody that is not familiar with Alex Dandy and they wouldn't be prejudiced in the trial of a case against him. Q. Would you be prejudiced in the trial of a case against him? A. *I believe I would.*" (Italics supplied.)

Stanley Preiser, a practicing attorney in the City of Charleston, answered the principal question thus: "In my opinion he cannot." He was asked, "Upon what do you base your opinion?", and replied: "Well, several things. First, Alex Dandy has—at least I have heard over and over again in the last four years he was affiliated with the State administration, a position in which his job, so to speak, wouldn't have been the most honorable one, he was accused of improper

conduct over and over by a large number of people. A lot of publicity in the newspapers indicated his activities are nefarious, so to speak, that he has a reputation, I think, in this community as not being an honest business man, and is guilty of some misconduct in the past State administration.'' This witness was then asked these additional questions with reference to his previous appearance as counsel for William Dandy, defendant's brother, and gave these answers: ''Q. In your petition in this Court, isn't it true you had lengthy allegations in your petition for William Dandy's change of venue, you had lengthy allegations to Alex Dandy? A. Yes. Q. And isn't it true that was one of the more important reasons you felt your client could not get a fair trial in this county? A. I don't know whether it was or stated to be a major reason, it said 'very substantial'.''

Joe Burdett, Secetary of State of West Virginia, stated that he had resided in Kanawha County since 1934, and answered the principal question thus: ''I don't think he could, no.'' When asked, ''Why don't you think so, Mr. Burdett?'', he replied, in part: ''Well, I think the publicity in nearly every instance I have seen, in reference to Alex Dandy, whether justified or not justified, is not in question, has been bad. I think it is common street talk, everybody that makes conversation about it refers to it in a derogatory manner to Mr. Dandy, as far as I know, because of the publicity. . . . I think anybody in the confines of this county has heard of Alex Dandy in a derogatory mein. I say the subconscious mind in this instance, as it will in every instance, will have some bearing on decisions.'' Mr. Burdett was asked if the publicity concerning Alex Dandy had been fairly constant in recent months and years and replied: ''It has been practically perpetual, as far as I know.''

Bertram C. Payne, a realtor of the City of Charleston, gave his answer to the principal question thus: ''I believe it would be practically impossible for any

honest individual to come into this Court completely free of mind, without being prejudiced because of the so-called notorious reputation that he has through newspapers and so forth." This witness further testified as follows: "Q. Do you have any knowledge as to what occasioned this reputation, where it has come from, if you know? A. News media. Q. Of what kind? A. TV, radio, newspapers. Q. Would you say that this has been a highly saturated kind of publicity, or just a casual thing? A. I would say he has been before the public quite a bit in recent years."

E. V. Byard, an automobile dealer in the City of Charleston, answered the question by stating: "I don't think he could." He was asked, "Why don't you, Gene, upon what do you base your opinion?", and replied: "Well, primarily through hearing conjecture on it, around the place of business, people talking about him, so forth, it seems to be a topic of conversation, I have heard people say, 'Well, I would send him up for a long time,' or 'I would give him the book,' and so forth, by people that I think don't even know him personally."

Raymond R. Humphreys, President of District 17, U.M.W.A., in explaining his answer to the general question that the defendant could not get a fair trial, stated: "Well, due to the publicity that he has had over the news media, radio, television, newspapers, and the people that I have talked to, it seems as though they have tried to convict him through the news media, that is my honest opinion." This witness further testified as follows: "Q. Ray, would you say this publicity is a thing that has extended over the years, or is it a very recent thing? A. I think it started about four years ago, maybe a little bit more, maybe a little bit earlier than that. Q. During this period have you heard anything on the news media which has been favorable to Alex Dandy, Ray? A. Not one word, no." Upon cross-examination this witness was asked whether or not, because of the manner in which jurors

were selected and qualified, it would affect his opinion as to the defendant's chances of getting a fair and impartial trial, and he replied: ''I don't think so, no.''

Donald Shonk, President of the City National Bank and City Treasurer of the City of Charleston, answered the principal question succinctly: ''I do not think he could get a fair trial here.'' He was asked the basis for his opinion and replied: ''Because of the adverse publicity he has had in various newspapers and other media in the valley in the past several years.''

Herbert W. Richardson, Judge of the Juvenile Court of Kanawha County, a life-long resident of Kanawha County, stated that he had been a judge in Kanawha County since 1949, and answered the principal question as follows: ''He cannot.'' He was then asked the following questions and gave these answers: ''Q. Why; would you tell me what leads you to form that opinion? A. Well, from what I read in the news media, by what I hear in the news media, I formed my own opinion of the guilt of Alex Dandy; plus what I have discussed with other people. Q. And do you feel, then, that Alex Dandy cannot get a fair trial by twelve impartial jurors in this county? A. I definitely feel that he cannot.'' The first two questions and answers that appear in the cross-examination of this witness are: ''Q. In other words, Judge, you made up your mind that he was guilty, you could not be qualified, yourself, to sit in this case? A. I could not qualify to sit on a jury in the trial of Alex Dandy. Q. And it is your opinion that all of the citizens of Kanawha County would not, as a whole, be fair and impartial in their judgment of this man, based upon the law and the evidence adduced at the trial? A. My answer would be 'Yes' to that question, I don't —If I—I don't feel if I can't qualify as a witness and give *and sit as a juror in the trial of Mr. Dandy, from the legal training that I have, and the judicial training*

*that I have had for more than sixteen years. I don't think most lay people could give him a fair trial, it would be most difficult, if not impossible, in my opinion.''* (Italics supplied.)

Sidney E. Goad, a resident of Clendenin and a practicing attorney in Kanawha County since 1933, stated: ''It is my opinion Mr. Dandy could not receive a fair trial at this time on those charges.'' When asked the basis for his opinion, he replied: ''Mr. Dandy, for the past several years, has been engaged in activities that in the mind and eyes of the public would be almost to the point of being notorious; and with that background and with the knowledge that the public have of the Dandy name, and Alex Dandy's name in particular, I do not believe he could receive a fair trial.'' He was asked, ''Has this information been wide-spread throughout the county?'', and replied, ''It certainly is.''

The following witnesses for the state, after qualifying in the manner that the defense witnesses were qualified and asked the same general question, testified as follows: E. A. Robertson, foreman of the grand jury which indicted Alex Dandy, stated: ''I think anyone would get a good trial in Kanawha County.''

Guy M. Escue, jury commissioner of the Intermediate Court of Kanawha County, in which the defendant was tried, answered: ''I think he would. . . . with the caliber of jurors, people we have on these juries, I think that they would render an unprejudiced opinion.'' On cross-examination of this witness, the following testimony was given: ''Q. Mr. Escue, have you read the articles this past week concerning the flood relief? A. No. Q. The trial of Ruth Maley? A. No, I didn't read it. Q. You have not read it? A. No. . . . Q. Have you read headlines in the front page this past week? A. Some of them. Q. Do you remember seeing anything about the Ruth Maley case? A. Yes. Q. During that week? A. Yes, I read some of that. Q.

Did you read the articles, Mr. Escue? A. I read some of them, I don't remember what part of them I read.''

Arthur Backus, Pastor of Morris Memorial Methodist Church in Kanawha City, answered the general question thus: ''I am sure he could receive a fair trial, or anyone, for that matter, in this county; I believe, I feel that the people of this county are open-minded enough and intelligent enough that we could impanel a dozen juries to give the man a fair trial.'' He was further asked, ''Do you mean a dozen juries, or a dozen jurors?'', and replied: ''A dozen juries.''

Nicholas Winowich, Library Director of the Kanawha County Public Library, answered the question thus: ''I do.'' He was then asked ''Why?'', and replied, ''I have two reasons. . . . One of which is I have a faith in mankind. Secondly, I had an experience last summer, for several weeks I served as a juror on Common Pleas Court, and it was my privilege on a number of occasions, three or four or five, whatever it might be, I served as a juror, and there were several phrases that—with which we had become familiar—'preponderance of evidence, clear beyond any shadow of a doubt, facts only;' and in the three, four, five cases in which I was involved there was an exchange of ideas back in the jury room, we all expressed ourselves, I think we were all conscientious enough to realize we didn't want to take a guess based on the facts presented; we hoped we could come up with the right verdict.''

Mrs. T. A. Galyean answered as follows: ''Yes, sir.'' On cross-examination she was asked this question and made the following answer: ''Q. And you are not, then, familiar with the—or are you familiar with the publicity by television and radio that Mr. Dandy has received in the last three or four months, in particular, especially, and then also in the last four or five years? A. I am familiar, I am a journalism major, I think they have been very careful not to purjury themselves, no names have ever been mentioned in the

editorials—unfortunately very few people are interested enough to read the editorial pages; I think there is a great apathy on the part of the citizens in this county in that respect.''

Veva McFadden of St. Albans, Kanawha County, answered the principal question as follows: ''I see no reason why he shouldn't get a fair trial in Kanawha County.'' On cross-examination, after stating that the matter was of ''complete disinterest'' to her, she was asked if she was aware of any bias or prejudice against Mr. Dandy and replied: ''It hasn't been mentioned to me, if there is.'' She was then asked this question and made the following answer: ''Q. Would you say there isn't any? A. No, there may be people that feel that way, that I don't know them.''

Eula Buckalew, Credit Manager for an automobile dealer of Charleston, stated: ''I believe that Mr. Dandy would receive a fair trial at this time, yes, sir.'' Upon cross-examination she was asked these questions and made these answers: ''Q. Have you read the newspaper accounts concerning Alex Dandy in the last four or five years, Mrs. Buckalew? A. I will have to confess I don't read the newspapers very often. Q. Have you heard or seen about Mr. Dandy on television in the last four or five years, more especially in the last several months? A. I don't watch television very often, either. Q. Then if you say that you were not aware of any bias or prejudice— A. (Interposing) I am not. Q. You wouldn't say there was none, would you? A. Well, I really don't know.... Q. Do you know Willie Dandy? A. Yes. Q. Did you know of any bias or prejudice existing against William Dandy? A. I didn't even know he did anything.''

William J. Reese, an operator at the Glasgow plant of Appalachian Power Company and a resident of Marmet in Kanawha County, stated that he was at that time ''running for Mayor on the Democrat ticket.'' He answered the general question by one word, ''Yes.'' After stating, on cross-examination, that he

had read many articles in the newspapers about Alex Dandy and the flood relief cases, he was asked this question and made the following answer: ''Q. You are not saying, are you, that there is no hatred, bias, or prejudice, you are just saying that you are not aware of it, is that correct? A. The people that I heard discuss him, the different articles that have been in the paper, I have not heard anyone say 'hate,' or anything like that.''

Mrs. Lucille Pianfetti, a housewife engaged in ''numerous vounteer activities'', stated: ''From my experience, I believe he would receive a fair trial.'' On cross-examination she was asked this question and made this answer: ''Q. Have you ever personally heard him discussed at all? A. Never.'' After the oral examination of witnesses was completed the parties stipulated as to the population of Kanawha County, West Virginia, according to the last United States census. The Court, after a recess, overruled the motion for a change of venue, whereupon the defendant moved for a continuance, which motion was likewise overruled. Thereafter the defendant entered a plea of not guilty and a jury was qualified. To summarize the procedure, it was in this order: the indictment was returned on January 18, 1965; there was a demurrer thereto on February 5, 1965; a motion to quash on the same day, and what was referred to as a plea in bar submitted likewise on the same day, but which was later changed to a plea in abatement on March 8, 1965; a request for a bill of particulars on March 10, 1965; petition for change of venue on March 16, 1965; and, as heretofore stated, after that was overruled, a motion for continuance and then the entry of a plea of not guilty.

This is the single syllabus point of *State v. Flaherty*, 42 W. Va. 240, 24 S. E. 885: ''The fact that a jury free from exception can be impanelled is not conclusive, on a motion for change of venue, that prejudice does not exist, endangering a fair trial, and will not

justify the court in refusing to receive other evidence to support such motion." In the opinion in that case Judge Brannon said: "That a jury is found free from exception personally to its members is not a final test. Influences, silent yet potential, may permeate the community, endangering an impartial trial. Motions for change of venue are passed upon before the impaneling the jury." This is the first syllabus point of *State v. Lutz,* 88 W. Va. 502, 107 S. E. 187: "The burden of proof is on the prisoner in a criminal case to show, to the satisfaction of the court, good cause for removal of his trial to a county other than that in which the crime was committed." In the opinion it is stated that "The only affidavit or other proof in support of the necessity for the change of venue was that made by the accused, . . . . That he did not produce or make an effort to produce . . . [another] person warrants the presumption either that no person could be found or that he made no effort to find him." In *State v. Powers,* 91 W. Va. 737, 113 S. E. 912, the denial of an application for change of venue was affirmed by this Court but a reading of the opinion shows that the reason therefor was that if there existed local prejudice or ill feeling against the prisoner it was proved to be in existence three months prior to the filing of the petition for a change of venue.

In *State v. Siers,* 103 W. Va. 30, 136 S. E. 503, this is the first syllabus point: "A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county." In the opinion is this statement: "The brief of the Attorney General insists that an impartial jury was obtained for the trial, and cites two Virginia cases holding that when an impartial jury is secured in the county, subsequent to the motion for a change of venue, it will be presumed that the motion was unfounded. That may be the law in Virginia, but the Attorney General has overlooked the West Virginia case of *State v. Flaherty,* 42 W. Va. 240, which specifically holds the fact that an impartial

jury was later impaneled, not to be conclusive on a motion for a change of venue, that prejudice against the accused did not exist, endangering a fair trial.''

The state relies upon the comparatively recent case of *State v. Hamric,* 151 W. Va. ____, 151 S. E 2d 252, to sustain the decision of the trial court in denying a change of venue in the instant case. The following quotation from the opinion of that case representing the unanimous opinion of this Court clearly distinguishes that case from the instant one upon the issue of venue:

"The first assignment of error we will take up is that dealing with the motion for a change of venue. *The affidavits and newspaper articles filed with said motion do not indicate that the publicity given to this case was inflamatory or that it would tend to influence the jury* in its determinations against returning a fair and just verdict. The burden is on the defendant to prove the need for a change of venue and the existence of prejudice at the time of the trial. The granting of such motion rests in the sound discretion of the trial court. *State v. Powers,* 91 W. Va. 737, 113 S. E. 912; *State v. Wooldridge,* 129 W. Va. 448, 40 S. E. 2d 899; *State v. Pietranton,* 140 W. Va. 444, 84 S. E. 2d 774; *State v. Loveless,* 140 W. Va. 875, 87 S. E. 2d 273. Point 2 of the syllabus in the *Wooldridge* case clearly states the law with respect to change of venue in the following language: 'To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests upon defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.' The mere existence of widespread publicity is not, in and of it-

self, sufficient to require a change of venue. *Bearden v. United States,* 304 F. 2d 532 (C.C.A. 5, 1962).

"It does not appear that the trial court abused its discretion in its refusal to grant a change of venue in the case at bar. The affidavits filed by the defendant and by the state were in conflict and *the newspaper articles filed in support of the motion, even though given wide publicity, would not be considered prejudicial to the defendant.* Therefore, the trial court did not err in refusing to grant a change of venue." (Italics supplied.)

Among the reasons the case may be distinguished is the sentence contained in the above quotation that "The good cause aforesaid must exist *at the time* application for a change of venue is made." (Italics supplied.) However, the state's primary reliance is upon the very recent case of *State v. Riley,* 151 W. Va. _____, 151 S. E. 2d 308. In that case the Court unanimously held that the affidavits and exhibits did not show that the trial court had abused its discretion in overruling a motion for a change of venue, but the contents of the affidavits therein are not discussed in detail. Specifically does the state rely upon the 8th and 9the points of the syllabus in the *Riley* case, which are as follows :

"8. It is uniformly held that a motion for a change of venue must be presented at the earliest practical moment.

"9. The general rule is that an application for a change of venue comes too late if it is made after the submission of other questions for the court's determination."

In the body of the opinion, after first determining the insufficiency of the affidavits, is this statement:

"However, there exists another controlling reason for the refusal to grant a change of venue in the case presented here; that is, because it was

not timely filed. It should be pointed out that several of the affidavits used in the motion for a change of venue were obtained on July 5, 1965, and when the defendant appeared with his attorney before the Circuit Court of Wirt County on July 28, 1965, he filed a plea in abatement and prayed that the indictment be quashed which was heard and overruled by the trial court, he filed a motion for a bill of particulars which was overruled by the trial court, and he entered a plea of not guilty upon which issue was joined and the case was set down for trial on October 4, 1965. No motion was made at that time for a change of venue. When the case was called for trial on October 4, 1965, the defendant moved for a continuance which was overruled, because good cause was not shown, and only then did the defendant move, out of the presence of the jury, for a change of venue, based only on his written motion, exhibits and affidavits, with no request to introduce any further evidence; and after hearing arguments on this motion, the court overruled it and proceeded to impanel the jury to try the defendant. It has been uniformly held that a motion for a change of venue must be presented at the earliest practical moment. . . .

"The general rule is that an application for a change of venue comes too late if it is made after submitting other questions for the court's determination. *State ex rel. Alfani v. Superior Court for Grays Harbour County,* 139 Wash. 125, 245 P. 929, 49 A.L.R. 801."

The quoted statements, and the syllabus points based thereon, are unquestionably sound as general propositions of law. 22 C.J.S., Criminal Law, § 202. However, the time of the filing of the application is only one of the factors to be considered in determining whether a defendant is entitled to a change of venue and while an important one it is not controlling. Whether such an application is timely or "seasonably" filed is determined by the surrounding cir-

cumstances and the "earliest practical moment" is dependent upon the facts in the particular case. *Nations v. U. S.*, C.C.A. Mo., 52 F. 2d 97. Among the elements to be considered in determining the timeliness of the application are the availability of the information, whether the court has ruled upon substantial questions or has indicated a view of the merits of a case, when the prejudice arose, when it was discovered, and whether adequate notice that such a motion is to be made has been given. 22 C.J.S., Criminal Law, § 202, and cases cited. The end of the Maley trial and her conviction occurred only a few days before the motion for a change of venue was made in the case, and that defendant herein had not yet moved for a continuance or entered a plea of not guilty. The defendant was charged with conspiring with Maley in the violation of a statute relating to alleged fraud in certain flood relief work and much of the adverse publicity which was circulated involving this defendant occurred during and after that trial. It is true, as heretofore stated, that the defendant had, prior to the making of the motion for a change of venue, taken certain action in the case but, to repeat, he had not moved for a continuance and he had not pleaded not guilty until after the motion for a change of venue was overruled. The "general rule" laid down in syllabus Point 9 of the *Riley* case is certainly subject to exceptions upon the facts of the case and certainly, upon the facts of this case, we find that such exceptions existed. The right of a fair and impartial trial guaranteed by the Constitution of the United States and by Article III, Section 14, of the constitution of this state is one which is held inviolate and must not be denied by a strict construction of the language used in the opinion of the *Riley* case.

In *State v. Wooldridge,* et al., 129 W. Va. 448, 40 S. E. 2d 899, the defendants were jointly indicted by a grand jury in Hancock County on April 11, 1944. This is an excerpt from the opinion in that case:

"There was no attack on the indictment, and on the day it was returned defendants appeared in open court, waived arraignment, *and entered their plea of not guilty*. On their motion further proceedings on the indictments were continued to April 24, 1944, on which day the defendants filed their petition for a change of venue, the hearing on which was continued to September 12, 1944, and from that date to September 15, following, when said motion was renewed. . . . It appears that on April 24, September 15, October 2, and December 2, and perhaps on other dates in the year 1944, proceedings were had on the motion and petition for a change of venue, including arguments on the demurrer aforesaid, affidavits, exhibits, consisting of newspaper clippings and other documents, all made a part of the record. . . .

"The trial began on January 24, 1945, and the motion for a change of venue was renewed on that date, and again overruled. . . ." (Italics Supplied.)

At no place in the *Wooldridge* or *Riley* opinions is the procedure followed in the *Wooldridge* case criticized. If the *Wooldridge* case were an exception to the general rule and if the motion for a change of venue came at the earliest practicable moment, certainly it cannot be said that such is not true in the instant case. Certainly, use of the terms the "general rule" and the "earliest practical moment" were not intended to lay down an inexorable rule that if any kind of proceeding took place in a criminal case prior to the making of a motion for a change of venue such motion, in every instance, came too late.

We find from the evidence, including the exhibits and the oral testimony, that the trial court abused its discretion when it denied the motion of the defendant for a change of venue and therefore the judgments of the Circuit Court of Kanawha County and the Intermediate Court of Kanawha County are reversed, the verdict is set aside, and the case will be remanded to the Intermediate Court for a new trial

and for such further proceedings as may be proper in accordance with the principles enunciated in this opinion.

> *Reversed and remanded*
> *with directions.*

BERRY, JUDGE, dissenting:

The majority opinion holds that the judgment in this case should be reversed because the trial court refused to grant the defendant's motion for a change of venue made on the day the case was set for trial. This motion was presented about one and one-half months after five motions, pleas and demurrer had been made by the defendant and ruled on by the court. Thirty-two witnesses testified in support of the defendant's motion and thirteen witnesses testified on behalf of the state in opposition to said motion. The witnesses for the defendant testified in effect that because of widespread publicity in the news media concerning the defendant they were of the opinion that he could not receive a fair trial in Kanawha County. The witnesses who testified for the State stated that he could receive a fair trial.

The trial court in ruling on said motion after hearing all evidence in connection therewith stated:

"I find that no wide-spread feeling of prejudice, or hatred, or ill will against the defendant such as would prevent him from receiving a fair trial in this Court *exinsts* in this county, at this time.

"True, the defendant's name has appeared in the news media on numerous occasions over the past four or five years. His associations with persons of high position in government and other activities and connections have no doubt been discussed both pro and con by several people both in this county and all of the other counties in this State.

"I have considered the petition, the exhibits, the testimony of all the witnesses on behalf of the defend-

ant and the State on the issue of whether there exists in this county such feeling of prejudice as would permeate a trial or interfere with the ends of justice. I find that such does not exist."

The case of *State v. Flaherty*, 42 W. Va. 240, 24 S. E. 885, held that a defendant was entitled to be heard on a motion for a change of venue regardless of whether or not a jury is impaneled free from exceptions and in that case it was reversed because the trial court did not allow the defendant to offer evidence in support of his motion for a change of venue. In the case at bar a full hearing was had before the trial court and the trial court considered all of the evidence and exhibits in support of the motion before ruling on said motion. The mere existence of widespread newspaper publicity is not in itself sufficient to require a change of venue. *State v. Hamric*, 151 W. Va. _____, 151 S. E. 2d 252, (decided by this Court July 15, 1966); *Bearden v. United States*, 304 F. 2d 532 (C.C.A.5, 1962).

The case of *State v. Siers*, 103 W. Va. 30, 136 S. E. 504, cited in the majority opinion is inappropriate for authority in the case at bar. The motion for a change of venue in the *Siers* case was timely made and affidavits alleged widespread hostile sentiment against the accused existed throughout the entire county which was uncontroverted by the State in any manner. In the case at bar thirteen reputable citizens testified that the defendant could have a fair trial in Kanawha County.

It has been repeatedly held that the burden rests on the defendant to prove the need for a change of venue and the existence of prejudice at the time of the trial and that the granting of such motion rests in the sound discretion of the trial court. *State v. Powers*, 91 W. Va. 737, 113 S. E. 912; *State v. Wooldridge*, 129 W. Va. 448, 40 S. E. 2d 899; *State v. Pietranton*, 140 W. Va. 444, 84 S. E. 2d 774; *State v. Loveless*, 140 W. Va. 875, 87 S. E. 2d 273; *State v. Hamric, supra; State*

*v. Riley,* 151, W. Va. ____, 151 S. E. 2d 308, (decided by this Court November 22, 1966).

The newspaper stories contained factual statements of instances in which the defendant was involved and it has been held that factual statements and widespread statements published by newspapers are not sufficient for a change of venue. *State v. Pietranton, supra; Bearden v. United States, supra; State v. Hamric, supra; State v. Riley, supra.*

It has also been held that it is not sufficient merely to show that prejudice exists against the defendant but it must appear that the prejudice against him was so great as to prevent him from receiving a fair and impartial trial. *State v. Beale,* 104 W. Va. 617, 141 S. E. 7, 141 S. E. 401; *State v. Riley, supra.* The testimony of the defendant's witnesses in the main was to the effect that in their opinion the defendant could not receive a fair trial because of news publicity and it has been held that where a motion for a change of venue has been refused in such cases it does not amount to abuse of the discretion by the trial court. *State v. Riley, supra.*

It is true that considerable publicity was carried by the news media over television and radio throughout West Virginia and in newspapers which were published throughout the State of West Virginia, and if the same evidence and exhibits were presented in other counties to which a change of venue might be granted and the ruling of this Court adhered to, it may be possible the defendant could not be tried for this alleged offense in any county in the State of West Virginia. This certainly would not be a good situation for the administration of justice in West Virginia.

Considering all the facts and circumstances surrounding the case at bar, I am of the opinion that the trial court did not abuse its discretion in the refusal to grant the defendant a change of venue. This is shown by the full hearing and consideration given to

this motion by the trial court on the day it was set for trial necessitating a continuance thereof until the hearing on the motion was disposed of. Then, too, the record of the trial clearly indicates that the defendant received a fair trial and a verdict of guilty returned by the jury was justified.

As was held in the case of *State v. Riley, supra,* there exists another controlling reason for the refusal to grant a change of venue in the instant case, and that is because of the fact that it was not timely made. The motion in the *Riley* case for a change of venue was made after other motions were made and ruled on by the court and it was held by this Court in that case, which was decided only a few months ago, citing authorities, that it is uniformly the law that a motion for a change of venue must be presented at the earliest practical moment. It certainly can not be said that the motion for a change of venue in the instant case was made at the earliest practical moment. Obviously, there was no intention to make such motion until it was ascertained what the ruling would be on other pleas and motions because if they were favorable the motion for a change of venue would not be necessary. In such cases the right granted to a defendant for a change of venue is waived unless such matter that would warrant a change of venue because a fair trial could not be obtained was not known before other motions, pleas, etc. had been filed and disposed of. This is clearly not shown in the case at bar, and this motion should have been made first. The record shows that the indictment was returned against the defendant on January 18, 1965; that a demurrer was filed alleging the indictment was not sufficient in law on February 5, 1965; a motion to quash the indictment was filed on February 5, 1965; and a plea in bar, later styled plea in abatement, was filed on February 5, 1965, all of which were overruled either by sustaining the demurrer filed thereto or otherwise, and on February 11, 1965, a motion for a bill of particulars was filed which motion was granted and a bill of parti-

culars filed on March 12, 1965. On March 10, 1965, a petition containing a written motion to furnish the minutes and records of the proceedings before the grand jury was denied by the court. It was not until the day this case was set for trial, on March 16, 1965, that the defendant presented to the trial court his petition for a change of venue, after which a full hearing was held as aforesaid and the motion overruled on March 16, 1965, after which a motion for continuance was made and overruled and the case proceeded to trial.

It was held in the *Riley* case that: ''The general rule is that an application for a change of venue comes too late if it is made after submitting other questions for the court's determination.'' It has also been repeatedly held that a motion for a change of venue comes too late after the case has been reached for trial and immediately before the jury has been impaneled and that a trial court does not abuse its discretion in refusing to grant a motion for a change of venue made on the day of the trial, and that it is not error for a trial court to deny a motion for a change of venue where the motion is not made until after the court has denied the motion to quash the indictment and has partially denied the motion for a bill of particulars and has denied a motion for a continuance because such motion is not timely made. *State v. Riley, supra.*

It can readily be seen that this Court has heretofore held that under facts and circumstances similar to those in the instant case a trial court does not abuse its discretion in the refusal to grant a motion for a change of venue and it is not reversible error in so holding. What was the law in this State three months ago should be the law now and neither the case of *State v. Hamric, supra,* nor the case of *State v. Riley, supra,* has been overruled.

As stated above, the defendant not only received a fair hearing on the motion for a change of venue

and the trial court did not abuse its discretion in the denial of such motion, but the evidence introduced during the trial of the case shows that the defendant received a fair trial because apparently his only defense, which is not a legal defense, was that the principal, Ruth Maley, made him submit false invoices before he could receive payment for work performed by his company. The evidence shows that false invoices submitted by Alex Dandy showing work purportedly performed by other companies which as actually done by the Pioneer Construction Company were used by Ruth Maley to falsify the records in the transmittal of such invoices and she knew and personally did such falsifying of the records after which he knowingly received checks in the names of fictitious companies for work performed by the Pioneer Construction Company, all of which makes Dandy an accessory, the crime for which he was charged.

For the reasons stated herein, I am compelled to dissent from the majority opinion in this case.