# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 16-1039** (Preston County 15-F-58)

**John Wayne Strawser, Jr.,**
**Defendant Below, Petitioner**

**FILED**

**November 17, 2017**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner John Wayne Strawser, Jr., by counsel Belinda A. Haynie, appeals the Circuit Court of Preston County's October 7, 2016, order denying his motion for judgment of acquittal, or in the alternative, for a new trial. A jury convicted petitioner of first degree murder and fleeing in a vehicle with reckless indifference, for which petitioner received a sentence of life in prison without the possibility of parole. Respondent State of West Virginia, by counsel Zachary A. Viglianco and Gordon L. Mowen, II, filed a response in support of the circuit court's order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

### Factual and Procedural Background

In October of 2015, a Preston County grand jury returned a three-count indictment charging petitioner with (1) first degree murder of his former girlfriend, Amy Lou Buckingham, (2) fleeing in a vehicle with reckless indifference, and (3) fleeing in a vehicle causing injury to a law enforcement officer. The third count was dismissed before trial. The remaining charges proceeded to a jury trial in August of 2016, and the jury convicted petitioner of first degree murder and did not recommend that he receive mercy. The jury also convicted petitioner of fleeing in a vehicle with reckless indifference. By Order entered on October 11, 2016, the circuit court sentenced petitioner to life in prison without the possibility of parole for the murder conviction and a consecutive prison term of one to five years for the fleeing conviction.

The evidence at trial was that, on April 16, 2015, petitioner visited the home where Ms. Buckingham resided in Tunnelton, West Virginia. Ms. Buckingham's father, son, and sister were at the residence at the time. Petitioner and Ms. Buckingham had ended their relationship at some point between December of 2014 and April of 2015, and Ms. Buckingham had begun dating another man.

1

The evidence revealed that petitioner entered the home and quickly exited. Ms. Buckingham followed him outside where the two argued in the driveway. Ms. Buckingham's father, son, and sister similarly testified to hearing a gunshot. When they exited the home, they discovered that Ms. Buckingham had been shot and claimed that petitioner drove off in a dark-colored Subaru. There were no eyewitnesses to the shooting. The medical evidence at trial was that Ms. Buckingham died of a single gunshot fired at close range, which pierced her breastbone and passed through her body. The physician who performed the victim's autopsy opined that the weapon used in the killing was not a small-caliber weapon, but also not a high-powered rifle.

Ms. Buckingham's sister called 911 and advised the dispatcher that petitioner had just shot the victim. The police responded to the call, located petitioner in his vehicle, and initiated a traffic stop. However, petitioner sped off after the officers attempted to have him exit the vehicle and eventually crashed in a field. Petitioner turned himself in the following day at his residence as police were executing a search warrant. Petitioner's clothing was wet and he was covered in pine needles. Petitioner gave a voluntary statement in which he denied shooting the victim. In his defense, petitioner presented the testimony of a neighbor of Ms. Buckingham, who testified that he heard a gunshot and heard the victim's father say "they shot her." Petitioner did not testify.

When petitioner was arrested after returning to his residence, State Police Trooper J.T. Gallaher searched petitioner and obtained his cell phone. Trooper Gallagher then, without a warrant, removed the phone's SIM card, placed the card into his computer, and viewed some of the data on the phone. Six months later, Trooper Gallaher obtained a warrant to search the contents of petitioner's phone. His search revealed multiple hostile text messages from petitioner to Ms. Buckingham on the day of the shooting, as well as pictures of different pistols, including a .44 caliber Rossi Ranch handgun.

During the search of petitioner's residence, the police located a 9 millimeter pistol and one fired .44 caliber Magnum cartridge. Petitioner's neighbor assisted the police in recovering a .44 caliber Rossi Ranch handgun that had been placed in a swampy area about a one-fourth of a mile from petitioner's residence. The neighbor informed the police that he and petitioner often hid things at the site where this gun was recovered. In his statement to the police, petitioner admitted to owning the 9 millimeter pistol, but denied owning a .44 caliber pistol. He claimed that he had the fired .44 cartridge because he often purchased empty shell casings for his 9 millimeter because they can be reloaded, which is less expensive than purchasing new ammunition. He claimed that the .44 caliber casing was included when he purchased 9 millimeter casings at an auction.

Phillip Cochran, West Virginia State Police forensic firearm examiner, examined the .44 caliber Rossi Ranch pistol and the spent .44 caliber casing. He testified that the gun was functional and that, according to toolmark analysis, the recovered cartridge had been fired from that gun. Comparing the gunshot residue on the victim's sweater and laboratory testing, Mr. Cochran testified that, if the .44 Rossi Ranch pistol was the murder weapon, it was fired less than 84 inches from the victim.

2

Petitioner filed multiple pretrial motions that are relevant to the instant appeal. First, petitioner sought a change of venue and requested funds to conduct research regarding pretrial publicity and whether a hostile sentiment against him existed in the area. Petitioner had a pending murder charge in Pennsylvania, which petitioner argued increased the media coverage and bias against him with respect to the Preston County charges. The circuit court allowed petitioner to engage Orion Strategies, the research and polling firm of his choice, to conduct a social media survey. Orion Strategies conducted the research and compiled a report, in which it concluded that the West Virginia criminal proceedings had received less coverage than the Pennsylvania proceedings, but that both cases had generated publicity. The report found, however, that the social media attention primarily related to memorial pages that the victim's family had established, that those who interacted with those pages likely knew the victim or her family, and, thus, would likely not be juror candidates for that reason. The circuit court declined to grant a change of venue, but ruled that it would make an individual determination of juror bias during voir dire.

The circuit court denied petitioner's request for additional funding to conduct a community survey to determine if a hostile sentiment against petitioner existed. The circuit court permitted the prosecuting attorney and defense counsel to conduct individual voir dire of potential jurors and granted every strike for cause that petitioner requested. Of the jurors who ultimately deliberated, all indicated that they could be fair and impartial and none indicated that they were aware of the Pennsylvania charges. However, on the last day of trial, an alternate juror reported to the circuit court that a houseguest, who knew the alternate juror was sitting on petitioner's jury, told the alternate juror of petitioner's Pennsylvania charges. The circuit court questioned the alternate, and the alternate denied that she told anyone on the jury what she had learned. The circuit court excused the alternate. Petitioner then moved for a mistrial, which the circuit court denied.

Petitioner also filed a motion to suppress evidence obtained from the search of his cell phone. The State conceded, and the circuit court agreed, that Trooper Gallaher's warrantless removal of the SIM card from the phone and viewing of data shortly after placing petitioner under arrest was unconstitutional. However, the circuit court went on to rule that the contents of the phone were nonetheless admissible under the "independent source" doctrine. The circuit court concluded that the subsequent search of the phone's contents, which was conducted pursuant to a warrant, produced admissible evidence. The circuit court found that the warrant, obtained six months after the arrest, did not rely upon the brief "unconstitutional peek" by Trooper Gallaher. Rather, Trooper Gallaher's application for the warrant relied upon other information lawfully obtained during the investigation.

Finally, petitioner sought to exclude evidence of the .44 Rossi Ranch handgun and handgun comparisons on the basis that the evidence was more prejudicial than probative and otherwise irrelevant. The circuit court denied petitioner's motion. The State admitted this evidence at trial through the testimony of Phillip Cochran that (1) the spent .44 caliber casing was fired from the .44 caliber Rossi Ranch handgun that was located in a swamp with the assistance of petitioner's neighbor, and (2) that, if that gun was used in the murder, it was fired from within 84 inches of the victim. Mr. Cochran also testified to his laboratory testing, which involved firing the Rossi Ranch handgun to replicate the amount of gunshot residue that was

found on the victim. The results were corroborated by the physician testimony that the gun used in the murder was not small caliber, but also not a high-caliber rifle.

The circuit court ruled that evidence of the forensic testing and distance determination regarding the gun was an applied science involving technical knowledge, rather than scientific knowledge, and, therefore, was admissible without the preliminary hearing required for scientific testimony. The circuit court also acknowledged that the .44 caliber Rossi Ranch handgun recovered from the swamp was not specifically identified as the murder weapon and the fired .44 caliber cartridge was not identified as the cartridge fired at the victim. However, the circuit court found that the location where the police recovered the gun suggested a connection to petitioner, and, thus, ruled that the .44 Rossi Ranch handgun was admissible evidence as it was more probative than prejudicial.

Following the jury's guilty verdict, petitioner filed a motion for judgment of acquittal, or in the alternative, for a new trial. With respect to petitioner's motion for a judgment of acquittal under Rule 29 of the West Virginia Rules of Criminal Procedure, petitioner contended the evidence was insufficient to sustain his convictions. The circuit court noted a defendant's "heavy burden"[1] to obtain reversal of a jury's verdict and that "evidentiary conflicts and credibility questions [are to be resolved] in the prosecution's favor."[2] With these standards in mind, and recognizing that circumstantial evidence satisfies the State's evidentiary standard, the circuit court concluded that a reasonable jury could have convicted petitioner of both first-degree murder and fleeing in a vehicle with reckless indifference.

Under Rule 33 of the West Virginia Rules of Criminal Procedure,[3] petitioner alternatively moved for a new trial challenging, in relevant part, the denial of (1) a change of venue; (2) funds to conduct a community survey prior to empaneling the jury; (3) his motion to suppress the contents of petitioner's cell phone; (4) his motion to exclude evidence regarding the Rossi .44 caliber and 9 millimeter handguns; and (5) his motion to suppress evidence of firearm comparisons and distance determinations.[4] The circuit court addressed and rejected each of petitioner's arguments for a new trial and denied petitioner's motion by order entered on October 7, 2016. This appeal followed.

**Discussion**

On appeal, petitioner raises five assignments of error, the first four of which challenge the circuit court's rulings on his motion for a new trial. "The main function of a motion for a new

---

[1] *See State v. Guthrie*, 194 W. Va. 657, 667-68, 461 S.E.2d 163, 173-74 (1995).

[2] *See* Syl. Pt. 2, in part, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

[3] "The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." W.Va. R. Crim. P. 33, in part.

[4] Petitioner raised additional arguments in his motion for a new trial that he does not raise on appeal to this Court. Thus, we need not address those arguments.

4

trial is to give the trial court an opportunity to correct errors in the proceedings before it without subjecting the parties to the expense and the inconvenience of prosecuting a proceeding in review." *State v. Cruikshank*, 138 W. Va. 332, 337, 76 S.E.2d 744, 748 (1953), *overruled on other grounds by State v. Bragg*, 140 W. Va. 585, 87 S.E.2d 689 (1955). "The question of whether a new trial should be granted is within the discretion of the trial court and is reviewable only in the case of abuse." *State v. Crouch*, 191 W. Va. 272, 275, 445 S.E.2d 213, 216 (1994) (citing *State v. King*, 173 W.Va. 164, 313 S.E.2d 440 (1984)).

In his first assignment of error, petitioner argues that he was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when the circuit court denied his request for funds to obtain a community survey to support his change of venue motion. Following petitioner's arrest in the present case, he was arrested for a "road rage" killing that occurred on Interstate 81 in Pennsylvania in January of 2014. According to petitioner, Pennsylvania law enforcement had no suspects until petitioner was arrested for the West Virginia murder and an acquaintance notified police that petitioner may have been involved in the Pennsylvania incident. Petitioner was charged with the Pennsylvania killing in September of 2015, which petitioner contended led to numerous articles, stories, and social media posts in and around Preston County regarding both killings.

Petitioner moved for a change of venue in the present case and requested public funds for (1) media and social media research and (2) a survey of 300 respondents to gauge if a hostile sentiment against petitioner existed in Preston County. As noted above, the circuit court allowed petitioner to engage Orion Strategies to conduct media/social media research, which revealed 1,256 media and social media mentions; 218 mentions related to the West Virginia charges and 1,038 mentions related to the Pennsylvania charges. Petitioner contended once "likes, shares, retweets" on social media were counted, the number of mentions jumped to 22,439. Orion Strategies concluded that given the rural setting of Preston County, word of mouth communication likely created a significant secondary source of information that could be further measured by interviewing a sample of respondents.

Indigent criminal defendants are entitled to public funds to retain expert witnesses in their defense. *See Ake v. Oklahoma,* 470 U.S. 68, 77 (1985) ("[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense."). Thus, we agree with petitioner that his request for public funds to retain the expert services of Orion Strategies implicates a constitutional right.[5] However, this right is not absolute and does not entitle an

---

[5] Petitioner invokes the Sixth Amendment's right to effective assistance of counsel as the source of this right. However, the State points out that under *Ake,* the United States Supreme Court held that the right flowed from the Fourteenth Amendment's due process clause, while other courts have relied upon the equal protection clause. Additionally, West Virginia has a statutory mechanism by which an indigent defendant may seek funding for expert witnesses and trial expenses upon a showing of need. *See* W.Va. Code § 29-21-13a. Because we agree with the circuit court that, under the facts this case, petitioner failed to demonstrate the necessity for the (continued . . .)

indigent defendant to unlimited access to public coffers; rather, indigent defendants must have access to experts such that they are afforded an "adequate opportunity" to present a complete defense. *See Ross v. Moffitt,* 417 U.S. 600, 616 (1974).

Applying these principles to the present case, we find no error in the circuit court's denial of additional public funding for Orion Strategies to conduct a community survey. Petitioner's argument in support of additional funds is undermined by the results of the research for which the circuit court approved funding. Although that research revealed that media and social media attention existed, it failed to provide compelling evidence of bias against petitioner that would warrant a change of venue. This Court has held that media attention, while relevant, is not dispositive of a request for a change of venue. *See State v. Dandy,* 151 W. Va. 547, 549, 153 S.E.2d 507, 508 (1967). The research found that the lion's share of media engagement originated from family and acquaintances of the victim – individuals who most likely would have been ineligible to sit on the jury. The circuit court's denial of additional funding is also corroborated by the fact that voir dire resulted in a jury that had no knowledge of petitioner whatsoever. Accordingly, we reject petitioner's first assignment of error.

Petitioner's second assignment of error challenges the circuit court's denial of his change of venue motion. As support, petitioner points to Orion Strategies' research that showed over 22,000 media references to petitioner, most of which mentioned petitioner's Pennsylvania charge. Petitioner argues that of the 41 jurors on the panel, 15 were struck for cause, which petitioner contended evidenced a hostile sentiment against him in Preston County. Also, petitioner points to the incident with the alternate juror as further evidence that the circuit court should have granted his change of venue motion.

This Court has held as follows:

1.    To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.

2.    A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county.

3.    One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether

---

additional expenditure of funds for the community survey in his attempt to support his change of venue motion, we need not determine the precise source of the right at issue.

the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant.

Syl. Pts. 1-3, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994) (citations omitted).

Petitioner contends that the trial should have been moved from Preston County because of the media coverage surrounding his Pennsylvania charge. However, "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syl. Pt. 1, *State v. Gangwer*, 169 W. Va. 177, 286 S.E.2d 389 (1982). Accordingly, negative media attention alone did not warrant moving the trial. And, contrary to petitioner's argument -- that the alternate juror became aware of petitioner's Pennsylvania charges during the trial and reported it to the judge -- actually supports the circuit court's denial of petitioner's motion. After the alternate reported that she learned information that she "shouldn't know," the court questioned the jurors again, who confirmed what they had indicated in voir dire -- they knew nothing of petitioner or his Pennsylvania charge. Thus, we find no abuse of discretion in the circuit court's denial of petitioner's change of venue motion.

In his third assignment of error, petitioner argues that law enforcement violated his Fourth Amendment right when they searched the contents of his cell phone without first obtaining a warrant. At the hearing on petitioner's suppression motion, Trooper Gallaher testified that he seized petitioner's cell phone at the time of arrest, removed the SIM card, and viewed the contents on his computer, all without consent or a warrant. The trooper denied looking at text messages, but admitted he looked at photos and recalled seeing a photo of a handgun that looked like the one police recovered in the swamp. The State obtained a search warrant about six months later. The State conceded that Trooper Gallaher's initial warrantless search of the phone was unconstitutional. However, relying on the "independent source exception" to the exclusionary rule, the circuit court permitted the State to admit the photos and text messages over petitioner's objection. The State used the photos to show that petitioner owned the .44 Rossi Ranch that was found in the swamp.

The question for this Court is whether the circuit court erred by finding the "independent source exception" to be applicable in this case. The Supreme Court of the United States has held that "[i]n the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *Murray v. United States,* 487 U.S. 533, 538-39 (1988) (citation omitted). In *Murray,* federal agents surveilled the defendant, who was seen driving a truck into and out of a warehouse and later turning the truck over to different drivers. The drivers were subsequently arrested and the truck was found to contain marijuana. Receiving this information, the agents entered the warehouse without a warrant and saw several burlap-wrapped bales in plain view. The agents left the warehouse without disturbing the bales and did not reenter until they obtained a warrant. When the agents applied for the warrant, they made no mention of their prior entry and did not rely on any of their observations during that entry. The defendant moved to suppress the evidence on the grounds that the warrant was tainted by the agents' prior warrantless entry of the warehouse. The district court denied the defendant's motion. On the appeal of that ruling, the

Supreme Court looked to the policy behind the exclusionary rule to determine whether to exclude the evidence, and stated that

> [t]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Id.* at 537 (quoting *Nix v. Williams,* 467 U.S. 431, 443 (1984)). *See also* Syl. Pt. 9, *State v. Peacher*, 167 W. Va. 540, 280 S.E.2d 559 (1981) ("An affidavit in support of an application for a search warrant which contains information that antedates, and is totally independent of, information learned from an unconstitutional search, as well as information from the unconstitutional search, may still be the basis upon which a valid search warrant may issue, if the information in the affidavit, excluding that information attributable to the unconstitutional search, is sufficient to justify a finding of probable cause.").

Applying these cases to the present case, we find *Murray* to be most instructive because Trooper Gallaher did not include in his search warrant affidavit any indication that he had already viewed at least some of the contents of petitioner's cell phone. The record reveals that in his affidavit, Trooper Gallaher stated that law enforcement was dispatched to the home of the victim who had been shot; that they learned while there that petitioner had been at the home and had a verbal altercation with the victim; that witnesses reported hearing a gunshot; and that witnesses observed petitioner leaving the scene. Further, upon our review, we find no basis to conclude that Trooper Gallaher's decision to seek a search warrant for the contents of petitioner's phone was prompted solely by his initial "peek" at those contents. Consistent with *Nix* and *Murray*, by admitting the evidence, the circuit court put law enforcement in the same position they would have been in had there been no misconduct by Trooper Gallaher. To exclude the evidence of the contents of petitioner's phone, especially in a first degree murder case, would put law enforcement in a worse position than it would have been in otherwise, and would have deprived the jury from viewing evidence lawfully obtained from an independent source. Accordingly, we find that the circuit court properly denied petitioner's motion to suppress evidence of the contents of his cell phone.

Petitioner's fourth assignment of error focuses on the admission of the State's evidence suggesting that petitioner owned the .44 Rossi firearm recovered from the swamp and that this weapon was used to kill the victim. Petitioner argues that the toolmark analysis and ballistic distance determination employed by the State Police Forensic Laboratory constituted "scientific" evidence requiring a hearing to determine its reliability, as mandated by *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

We start our analysis with Rule 702(a) of the West Virginia Rules of Evidence, which provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." While the application of the heightened "gatekeeping" function of *Daubert* has been extended to all types of expert testimony offered in federal courts, this Court has declined to extend its application to evidence requiring "technical or other specialized knowledge." *See Watson v. Inco Alloys Int'l, Inc.,* 209 W. Va. 234, 545 S.E.2d 294 (2001). So, at issue, then, is the distinction between "scientific" and "technical" knowledge. We have stated that

> [s]cientific knowledge differs from technical and specialized knowledge in that it is a validation. Scientific knowledge is the process of formulating a hypothesis and then engaging in experimentation or observation to verify or falsify that hypothesis. It is this knowledge garnered from experimentation and observation that was offered as evidence in *Daubert.*

*Watson* at 240, 545 S.E.2d at 300.

In the present case, the circuit court properly determined that the challenged evidence – toolmark and ballistic distance determination – was technical, rather than scientific. As the State correctly argues, toolmark and ballistic distance determination involves subjective comparison between known and unknown samples; it does not involve the formulation and testing of a hypothesis. *See United States v. Montiero*, 407 F.Supp.2d 351 (D. Mass. 2006). Therefore, we reject petitioner's fourth assignment of error because this evidence did not require *Daubert* hearing prior to its admission.

Petitioner's final assignment of error is that the circuit court should have granted his motion for judgment of acquittal because there was insufficient evidence to sustain his convictions. Petitioner asserts that the evidence was entirely circumstantial given that the State produced no witness who saw petitioner shoot the victim.[6] This Court has held as follows:

> 1.      "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

> 2.      When a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor;

---

[6] Petitioner refers to his convictions, in the plural; however, his argument addresses only his first degree murder conviction.

moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt.

Syl. Pts. 1 and 2, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

In the present case, three people testified that petitioner called the victim before arriving at her house; that the victim followed petitioner outside; they argued next to petitioner's car; no one else was there; they heard a gunshot; and saw petitioner leaving the scene in his car. This evidence, albeit circumstantial, was sufficient to sustain petitioner's convictions. However, the State introduced additional evidence to corroborate its theory that petitioner shot the victim, i.e., that petitioner used a .44 caliber handgun that was later found in a swamp near his home and that petitioner had the motive to kill the victim, as evidenced by hostile text messages he sent to her the day of the murder regarding the victim having a new boyfriend. Reviewing this evidence in the light most favorable to the State, it was sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Accordingly, we find no error in the denial of petitioner's motion for judgment of acquittal.

## Conclusion

For the foregoing reasons, we affirm the Circuit Court of Preston County's "Opinion Order Denying Defendant's Motion for Judgment of Acquittal or, in the Alternative, a New Trial," entered on October 7, 2016.

Affirmed.

**ISSUED:** November 17, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

**DISSENTING:**

Justice Robin Jean Davis
Justice Margaret L. Workman

10